IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ARCHITECTURAL GRANITE &** | § | |
| **MARBLE, LLC,** | § | |
| | § | |
| Plaintiff and Counter-Defendant, | § | |
| | § | |
| v. | § | Civil Action No. **3:20-CV-295-L** |
| | § | |
| **PARMINDER PENTAL,** | § | |
| | § | |
| Defendant and Counterclaimant, | § | |
| v. | § | |
| | § | |
| **SELECT INTERIOR CONCEPTS, INC.,** | § | |
| | § | |
| Counter-Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Architectural Granite & Marble, LLC's and Select Interior Concepts, Inc.'s Motion for Summary Judgment ("Motion") (Doc. 162), filed June 10, 2022, in which dismissal of all counterclaims by Parminder Pental is sought. For the reasons herein explained, the court **grants** the Motion.

## I.    Factual and Procedural Background

Select Interior Concepts, Inc. ("SIC") and Architectural Granite & Marble, LLC ("AGM") (collectively, "the Company") brought this action against Parminder Pental ("Mr. Pental," "Defendant," or "Defendant Pental," and at times "Peter") on February 6, 2020.[1] In AGM's

---

[1] In the Second Amended Complaint, SIC is no longer included in the case caption or identified as a plaintiff in this case. Instead, the Second Amended Complaint refers to AGM as the sole "Plaintiff" in this action. Apparently recognizing that SIC cannot avoid potential liability for the retaliation counterclaim previously asserted against it by Defendant Parminder Pental (*see* Docs. 10, 37), SIC has continued to participate in the proceedings in this case as a "Counter-Defendant" with respect to Mr. Pental's retaliation counterclaim. The court prefers to avoid the use of terms like "Counter-Defendant" and "Counter-Plaintiff" in identifying the parties because it is often confusing; however, under the circumstances, it refers to SIC as "Counter-Defendant" in the case caption so that it is clear that SIC remains a party to this action, even though it is no longer seeking relief as a plaintiff against Defendant Pental. For purposes of clarity, the case caption also refers to AGM as "Plaintiff and Counter-Defendant," and Mr. Pental as "Defendant

Second Amended Complaint (Doc. 40), filed March 29, 2021, AGM asserts causes of action against Mr. Pental under Texas law for breach of a Purchase Agreement (Count 1) and breach of an Employment Agreement (Count 2). Regarding these claims, AGM contends that Mr. Pental breached the confidentiality provisions in his Employment and Purchase Agreements by: (1) using confidential information acquired by him during his employment to create and work for a competing company with Luke Spiller (former vice president of purchasing for AGM) while he was still employed by the Company; and (2) not returning AGM's confidential information after leaving the Company.[2]

Mr. Pental has asserted counterclaims against AGM and SIC, contending that the Company breached his Employment Agreement by failing and refusing to give him severance pay.[3] The parties dispute whether Mr. Pental voluntarily resigned or was constructively discharged in retaliation for his allegedly reporting concerns about a "potential securities law violation" to SIC's chief operating officer ("COO") Tyrone Johnson ("Mr. Johnson" or "Ty" or "Tyrone") and AGM's chief executive officer ("CEO") Sunil Palakodati ("Mr. Palakodati" or "Sunil") in June and July of 2018.[4] Def.'s App. 499. Mr. Pental also argues that the confidentiality provisions in his Employment and Purchase Agreements are illegal and unenforceable, and he asserts two separate

---

and Counterclaimant," as Mr. Pental has also asserted counterclaims against AGM. The parties' briefs refer to AGM and SIC collectively as "the Company." For consistency purposes, the undersigned similarly uses the term "the Company" in this memorandum opinion and order in referring to AGM and SIC collectively when appropriate.

[2] These claims are not the subject of the Company's current summary judgment motion. Defendant Pental previously moved for summary judgment on these claims, but the court denied Defendant's Motion for Partial Summary Judgment as to these claims on January 9, 2023. *See* Doc. 226.

[3] Pursuant to section 5(f)(ii) and 5(g) of his Employment Agreement, Mr. Pental was entitled to severance pay if he terminated his employment for "Good Reason," and "execut[ed] and deliver[ed] to the Company, within fifty (50) days of the date of termination, . . . a written release in a form reasonably acceptable to the Company[.]" The Co.'s App. 122-23.

[4] Unless otherwise indicated—through the use of words or phrases such as "disputes," "contends," "asserts," "alleges," "according to," or similar language—the facts contained herein are undisputed.

but related claims or requests for declaratory judgments in this action against AGM regarding the legality of these provisions. In addition, he asserts a counterclaim against AGM and SIC for alleged retaliation in violation of Section 8 of the Sarbanes Oxley Act ("SOX" or "the Act"), 18 U.S.C. § 1514A.

In 2015, private equity company Trive Capital Holdings, LLC ("Trive") formed SIC to hold the interests of Architectural Surfaces Group, LLC ("ASG"). That same year, ASG acquired AGM, of which Luke Spiller was a founding member. The relationship of the parties to this action began in 2017, when Mr. Pental and his brother Ravinder Pental ("Ravi Pental" or "Ravi") sold their company Pental Granite and Marble, LLC ("PGM" or "Pental") to AGM. The owners of the companies acquired by AGM were referred to as "legacy founders," "founding members," or "founders." Trive used AGM to acquire smaller companies like PGM in diverse geographical regions to grow AGM's business. AGM is the wholly owned subsidiary of parent company SIC, which is made up of AGM and Residential Design Services ("RDS"). The AGS or AGM side of the business distributed natural and engineered stone products nationally, whereas RDS offered design and installation services to customers.

As part of the sale of PGM to AGM, Mr. Pental accepted employment with AGM, was given the position or title of "Executive" of AGM, and received an annual base salary of $250,000. Def.'s App. 48-49. The precise terms of Mr. Pental's employment were set forth in his February 2017 Employment Agreement with Trive. The Employment Agreement, however, does not provide a detailed description of Mr. Pental's Executive duties. It, instead, provides as follows regarding his duties:

> During Executive's employment with the Company, Executive agrees to devote Executive's full time and energy and all of Executive's skill and best efforts to the performance of Executive's duties, **as assigned by the Company**, and to the business of the Company; **provided, that the foregoing shall not limit Executive**

> **from serving as Manager of TCFI G&M LLC**, a Delaware limited liability company (as such term is defined in the Third Amended and Restated Limited Liability Company Agreement thereof, as amended and restated from time to time (the ***"LLC Agreement"***), **or as a manager, director or officer of any Affiliate** thereof, or from engaging in other activities with the Company's prior written consent.

*Id.* at 49 (emphasis added).

Although the Employment Agreement only specifies that Mr. Pental would have the role of an Executive of AGM, the parties acknowledge that he served as the president of AGM after he sold PGM to AGM.  In this role, Mr. Pental was involved in AGM's operations and natural stone procurement. Following the sale of PGM, Mr. Pental initially reported to AGM's CEO Mr. Palakodati, who in turn reported to SIC's COO Mr. Johnson.

On August 16, 2018, SIC "went public" and began trading stock on NASDAQ.[5]  To celebrate the event on August 16, 2018, Mr. Pental and a few other employees were invited to attend a closing bell ceremony for the Company at NASDAQ[6] in New York City.  At the ceremony, Mr. Pental stood in the front row next to Mr. Johnson.  Before SIC went public, Mr. Pental and Luke Spiller approached Mr. Palakodati in June 2018[7] and Mr. Johnson in July 2018.

Mr. Pental contends that they approached Mr. Palakodati and Mr. Johnson to express their concern that the Company or SIC had misrepresented SIC's financial condition in SEC filings by artificially inflating revenue in anticipation of SIC going public in 2018. According to Mr. Pental, their concern was based on the Company's accounting treatment of the sale of AGM's

---

[5] SIC's registration form with the Securities and Exchange Commission ("SEC") to become a publicly traded company became effective as of August 13, 2018.

[6] NASDAQ is an acronym for National Association of Securities Dealers Automated Quotations, an American stock market that handles electronic securities trading around the world.

[7] Mr. Pental contends that he and Luke Spiller advised Mr. Palakodati regarding their concern about the Bedrock Transactions on June 18, 2018, while the three of them were driving from Dallas, Texas, to Austin, Texas, for a meeting. The "evidence" Mr. Pental refers to, however, only indicates that this conversation took place in June 2018.

**Memorandum Opinion and Order – Page 4**

MetroQuartz ("MQ") to another company (Bedrock) in late 2017, which Mr. Pental refers to as the "Bedrock Transactions." Def.'s Am. Ans. & Counterclaims 25-26 (Doc. 56). The Company, on the other hand, contends that the issue or concern conveyed by Mr. Pental and Luke Spiller pertained not to the accounting treatment of the MQ sale but instead to Luke Spiller's concern that Bedrock owner Byron Dougherty was unhappy with the earnout payout amount he received from the sale of Bedrock to AGM, and that Mr. Dougherty had threatened to sue.

Mr. Pental and Luke Spiller first approached Mr. Palakodati in June 2018. Unhappy with Mr. Palakodati's seeming lack of interest in the matter, they then approached Mr. Johnson in July 2018. They told Mr. Johnson that they had also spoken to Mr. Palakodati, and that they were raising the issue with him because Mr. Palakodati had not done anything to address their concern. Shortly after speaking with Mr. Pental and Luke Spiller, Mr. Johnson followed up with them to let them know that he had spoken with the Company's legal counsel, who advised there was nothing to worry about as far as a potential suit by Mr. Dougherty because the Company had insurance that would cover any such dispute, and the evidence supporting a lawsuit on this basis was weak.

There is no evidence that Mr. Johnson and Mr. Palakodati ever discussed this issue with each other. There is also no indication that this issue was ever discussed again within the Company. Mr. Pental, nevertheless, contends that, within a month of notifying Mr. Johnson and SIC going public, Mr. Johnson and Mr. Palakodati embarked on a joint campaign and pattern of escalating retaliatory actions against him (and Luke Spiller) in an effort to drive them both out of the Company. Def.'s Resp. 1, 40.

Mr. Palakodati's relationship with some of the legacy members, including Mr. Pental, was quite contentious from the beginning. According to information shared by and with Mr. Pental and Luke Spiller, the legacy members and those hired by the legacy members questioned Mr.

Palakodati's business decisions, and he in turn questioned their commitment and ability to reach goals set by the Company.  The Co.'s App. 38-39.  Mr. Palakodati was also accused of spreading rumors about founding members.  From the time of the sale of PGM in early 2017 through January 2019, the personal and business relationship between Mr. Palakodati and Mr. Pental was similarly tumultuous with Mr. Pental questioning Mr. Palakodati's leadership and the changes in business operations implemented by him soon after Mr. Pental's company PGM was purchased by AGM. *See* Def.'s App. 474.

During this same time, the relationship between Mr. Palakodati and Mr. Pental became increasingly strained. Earlier electronic messages shared between Mr. Palakodati, Mr. Pental, and Luke Spiller on June 21, 2018, though, only three days after the date Mr. Pental contends he engaged in protected activity by discussing the Bedrock Transactions with Mr. Palakodati, indicate that Mr. Palakodati respected Mr. Pental and Luke Spiller.[8]  During this exchange, Mr. Pental also stated that the three of them made a "very strong team." *Id.*

On August 28, 2018, Mr. Pental filed a complaint with the Company's human resources department against Mr. Palakodati regarding a personal or family matter. In the complaint, Mr. Pental alleged that, after a vendor meeting on June 19, 2018, Mr. Palakodati told him that, "when he leaves the [C]ompany[,] he will talk to [his] brother Ravi Pental and try to change Ravi's opinion about [him]," and that Ravi had "extremely bitter feelings" about him.  Def.'s App. 414. In addition, Mr. Pental alleged in the complaint that a few days later Mr. Palakodati also told him that his brother Ravi was "not happy with his share in the Oldco (before [they] sold [their] majority

---

[8] On June 21, 2018, Mr. Palakodati messaged Mr. Pental and Luke Spiller: "I was thinking about the sample obsolete risk. . . . Peter: I thought you were amazing. I learned from you today. You are brilliant.  Luke: You did an awesome job holding the line. You are a smart guy. I enjoy working with you both." Def.'s App. 384.  To this, Mr. Pental responded: " We make a very strong team. We were so well aligned."  *Id.*

shares [in PGM] to Trive Capital)."[9]  *Id.* at 415.  Mr. Pental alleged that, in interfering with or threatening to interfere with his personal relationship with his brother, Mr. Palakodati had caused him and his family in India great emotional distress.  It is not clear why Mr. Pental waited approximately one month after this conversation before complaining to human resources about Mr. Palakodati's remarks.

Human resources immediately notified Mr. Johnson of Mr. Pental's complaint, and Mr. Johnson in turn notified Mr. Palakodati of the complaint on September 1, 2018, but asked him not to telephone Mr. Pental about it.  In an e-mail to Mr. Johnson, Mr. Palakodati did not deny having the conversation with Mr. Pental.  He, instead, expressed his frustration as follows:  "Ty—Quite frustrating that I am getting dragged into their [Ravi and Peter Pental's] stuff. Let's definitely talk and find a permanent fix or else this will not go away."  Def.'s App. 414.

The next day, after giving it more thought, Mr. Palakodati provided additional information to Mr. Johnson to put in context why he had the discussion with Mr. Pental and what he thought "might be coming at us" next:

> I am very surprised and disappointed that Peter Pental has chosen to take a personal conversation into a business setting. Both Peter Pental and Ravi Pental have shared multiple times their personal bonding and respect towards me and treated me like their family member . . . Out of pure personal favor with an intent to bridge the relationship between the two brothers that I respected and cared for, I offered to help in any[] way I can to help resolve their differences. Ravi shared his frustrations while we were in India visiting suppliers in front of another founder who can witness it. . . . My initial response from this complaint and recent events was a major surprise[,] but thinking deeply over the weekend[,] this may be a pattern for more distractions to come.

*Id.* at 415-1.

Mr. Palakodati concluded by explaining that, over the past few months, increased pressure had been placed on the "legacy founders" of the previously acquired companies after several key

---

[9] Mr. Pental's reference to "Oldco" appears to refer to his and his brother's former company PGM.

people did not meet projected targets. Between this pressure, actions taken to reduce dependency on "legacy founders" that could add to the founders' frustrations, and the recent reduction in force discussion, which employees were already talking about, he anticipated that there would be "more people on the edge who can create more distractions." *Id.* When deposed, Ravi Pental denied ever talking to Sunil about personal stuff and attributed Sunil's explanation to "politics." Def.'s App. 741.

Subsequently, on November 1, 2018, Mr. Pental sent a lengthy e-mail to Mr. Johnson in which he criticized Mr. Palakodati's business decisions and leadership. The Co.'s App. 38-39. Mr. Pental blamed Mr. Palakodati for low employee morale, turnover, and recent layoffs of employees that he considered to be valuable to the business. Mr. Pental indicated that he had spoken with Mr. Palakodati the night before and "told him that the perception on [the] Pental side is that[,] if you kiss Sunil's ass, you get promoted and get favoritism[,] but if you have the strength to mention the facts, you will either be fired or you will not be promoted." *Id.* at 38. Mr. Pental expressed the opinion that this was "a major concern" and went on to provide examples of Mr. Palakodati's business decisions that he thought had led to low employee morale, resignations, and layoffs of key employees that Mr. Palakodati replaced with persons with no experience who were not performing well. *Id.* Mr. Pental, therefore, believed and suggested that it would be better if Mr. Palakodati was given a "different role" in the Company or reassigned "to the RDS side" of the business. *Id.* at 39.

During this same time frame, Luke Spiller also filed a complaint with human resources against Mr. Palakodati based on information he received from a former employee on August 7, 2018, about disparaging statements that Mr. Palakodati had made several months earlier to the former employee and another employee in December 2017, well before he and Mr. Pental

approached Mr. Palakodati in July 2018. According to the former employee, Mr. Palakodati offered him and another person Luke Spiller's job overseeing the purchasing department because, according to Mr. Palakodati, "Luke can't be trusted[] and is the scum of the earth. He even tried to screw over his family. Did you know that he tried to cheat his cousins . . . and his Uncle . . . out of a shit ton of money." Def.'s App. 424.  When the former employee asked Mr. Palakodati why Luke Spiller would want to stay with the Company under the circumstances, he responded, without elaborating, that "he didn't know why, but [he believed] that money changed owners [founders] like Luke and Peter [Pental] after they got paid" for the sale of their companies.  *Id.*

Two months later, Luke Spiller notified human resources and stated, "I'm told that the disparaging remarks have not completely stopped!  . . . It amazes me (literally boggles my mind) that with all the challenges we face, in regarding to successfully growing ASG—that I have to deal with this nonsense!  It is very distracting."  *Id.* at 420.  Luke Spiller further asserted that he could identify "more than 10 people across the [C]ompany" to whom "Sunil has said defamatory and/or disparaging things about me. . . . The list doesn't stop from within the [C]ompany; it includes suppliers." *Id.* at 421.   Mr. Spiller concluded by asserting that he had "helped hire a lot of people at ASG, and spent [his] whole career, nearly 17 years . . . building this business," and he expressed the opinion that the situation involving Mr. Palakodati was "not fair to [his] family, . . .valued employees [or] . . .  investors." *Id.*

When deposed, Mr. Johnson attributed the issues and complaints going back and forth between Mr. Pental and Mr. Palakodati to be "cultural stuff" or differences in "personalities" that had nothing to do with the issue that Mr. Pental and Luke Spiller had previously brought to his attention.  The Co.'s Reply App. 5; The Co.'s App. 103.  Mr. Pental, Luke Spiller, and Mr. Palakodati had all expressed concerns to Mr. Johnson regarding what he referred to as the

"organizational dynamics within ASG," that is, the relationships between the three of them and the way in which they were working or not working together. *Id.* at 101. Mr. Johnson met with the three men in November 2018 in Atlanta, Georgia, to address what in his opinion was "clearly dysfunctionality" that was affecting the business because these three key people in the organization were not working together effectively and could not "get on the same page." *Id*. at 102.  Because he had heard different things from each of them at different times, he met with them each individually before meeting with them again as a group. He warned them that "you guys have to get along, otherwise somebody is going to be fired." *Id.* at 104.  Mr. Johnson clarified in his deposition that these were not his exact words but he:

> made it clear that if they [were] not able to get along, [they] w[ould] force me to make changes, and I w[ould] make them because I have a fiduciary responsibility and this business [could not] be run in the dysfunctional manner that it is. So I made it very clear that if we are not able to figure out how to make this thing work, then I'll make changes. And by the way, I said, those changes could include terminations, those changes could include different roles, but we will make changes because the organization cannot continue to work the way it's working.

*Id*. When asked if he had considered at this point whether the problem between the three men "had to do with the accounting issues," allegedly reported by Luke Spiller and Mr. Pental, Mr. Johnson responded, "No, I genuinely assumed this had to do with personalities." *Id.* at 103.

Mr. Palakodati similarly testified in his deposition that he, Luke Spiller, and Mr. Pental were summoned to Atlanta by Mr. Johnson for the purpose of talking about their respective complaints about each other to see whether they could rebuild their working relationships.  Def.'s App. 689-90.  Mr. Palakodati also testified that Mr. Johnson met with them individually before meeting with them all together.  Mr. Palakodati further testified that, after the Atlanta meeting, he attempted to amend his working relationship by approaching Mr. Pental and Luke Spiller separately to explain what he believed was a misunderstanding and apologizing to Luke Spiller for

some of the comments he had made.  Def.'s App. 690.  According to Mr. Palakodati, Mr. Pental also told Peter Pichette that it was a misunderstanding and that he "took back" his complaint.  *Id.*

When deposed, Mr. Pental acknowledged that Mr. Johnson told him, Luke Spiller, and Mr. Palakodati in the Atlanta meeting that he would let one or all of them go from the Company if they could not find a way to work together.  Def.'s App. 732.  He has taken the position though that the warning Mr. Johnson gave in the Atlanta meeting was a "veiled threat[]" directed at him personally "that[,] if he did not stop raising the MQ accounting issues, the Company would fire him[.]"  Def.'s Resp. 33 (citing Def.'s App. 5).  When deposed, however, Mr. Pental conceded that he could not recall whether he actually "us[ed] or br[ought] up the exact Metro Quartz fraudulent sale" in the Bedrock Transactions during the Atlanta meeting.  The Co.'s App. 32.  He testified that he, nevertheless, did say in "broader terms" something along the line that he hoped he was not "being penalized because of doing the right things."  *Id.*

The discussions between Mr. Johnson and Mr. Pental regarding Mr. Pental's new role in the Company started in November 2018 after the Atlanta meeting and continued through the end of January 2019.  *See* Def.'s App. 437-38, 469-70, 474-75, 477, 479.  During the discussions with Mr. Johnson, Mr. Pental vacillated between accepting and embracing the changes and outright rejecting them.  *See id.* Of particular concern was the change in his salary and the changes in his responsibilities. He wanted to continue procuring natural stone for AGM and participating in AGM's or ASG's operations meetings.

When deposed, Mr. Johnson denied taking steps approximately one week after the Atlanta meeting to fire Mr. Pental either because of the concern previously raised by Mr. Pental and Luke Spiller or for any other reason, but he admitted to starting to make changes in his role in the Company:

> I actually start[ed] to make changes that Peter asked me to make because he didn't want to work for Sunil anymore. And it's very clear in his notes, he didn't think he was a good leader, he didn't think he was capable, and I had a lot of respect for Peter. I thought Peter had a lot of value to the [C]ompany and asked Peter to come work for me. In a lot of cases, working for the CEO[] is kind of a nice thing, and he was fine.

Def.'s App. 104.

On November 21, 2018,  Mr. Johnson and Mr. Pental had a telephone conference to discuss the details of his new role in the [C]ompany.  Def.'s App. 437.  Two days later, Mr. Pental sent an e-mail to Mr. Johnson titled "Future plan," in which he thanked Mr. Johnson for the telephone call, stated that he admired Mr. Johnson's foresight," and requested clarification regarding specific details concerning his new role and responsibilities.  *Id.*  Mr. Pental also made some suggestions about how to implement the plan.

The two exchanged e-mails to address the issues raised by Mr. Pental with each noting their comments and responses to the others on the original e-mail sent by Mr. Pental.  *Id.* at 436-38. As part of this future plan, Mr. Johnson advised Mr. Pental that he would be taking on a new role in the Company as COO of SIC and reporting directly to him, rather than Mr. Palakodati, who also reported to him.  As a result of this and other ASG supply chain changes, Mr. Pental would be Mr. Palakodati's equal and would transition from AGM natural stone procurement to SIC growth initiatives involving Quartz products.

On December 20, 2018, Mr. Johnson and Mr. Pental exchanged several e-mails throughout the day. The e-mail exchange started with Mr. Johnson forwarding "the agreement that I promised you that details the role we discussed" and asking Mr. Pental to review it, so they could discuss the matter further.  The Co.'s App. 51. Mr. Pental responded that there was "nothing to discuss, this agreement does not work for me and I am happy with my current employment agreement that I signed with Trive." *Id.* at 50.

**Memorandum Opinion and Order – Page 12**

Mr. Johnson said that he was not familiar with the Trive agreement but explained that the "point of the new agreement is to make clear your new role and responsibilities as part of SIC reporting to me." *Id.* Mr. Johnson further stated that, if there were certain aspects of Mr. Pental's Thrive Employment Agreement that he would like to have incorporated into the new agreement, he was happy to consider that. Mr. Pental responded that he was not willing to enter a new employment agreement and did not want to be put in an awkward position by having to discuss the matter any further.

To this, Mr. Johnson responded that he would review Mr. Pental's current agreement, but he insisted that they would still need to discuss his role in the Company. Mr. Johnson indicated that he "was not sure why this is awkward for you" because they had previously discussed changing his job responsibilities, and "it did not seem to be an issue at that time." *Id.* Mr. Pental reiterated: "It is very awkward to me. When we sold our majority shares to Trive[,] we signed an employment agreement. That works for me. What you sent does not work for me[.]" *Id.* at 49. Mr. Johnson responded: "Okay. This wasn't intended to upset you. Just tell me how you would like to go about documenting what we discussed." *Id.*

Mr. Pental responded that he thought a base salary of $450,000 (rather than the $100,000 salary proposed by Mr. Johnson) for acting as a quartz consultant, together with "all terms and condition of [his] current employment agreement and [the] option plan you gave me, would be a good start[.]" *Id.* Mr. Johnson answered "You must have a very different perspective of what it is I'm looking for. We should probably discuss live. Let's chat next week. Happy holidays to you and your family." *Id.* at 48. Mr. Pental replied: "Merry Christmas. Enjoy the Amarone wine I sent you. Let me know how you like it." *Id.* To this, Mr. Johnson asked: "Will do. Open for 24 hrs and let it breathe first correct?" *Id.* Mr. Pental then confirmed that this was correct.

On January 8, 2019, Mr. Johnson e-mailed Mr. Pental to "recap [their] discussion today" about the change in his role that would include the following "primary job responsibilities moving forward":

> 1. Work with Vicastone and the [C]ompany to find mutually beneficial terms to extend our exclusive agreement well beyond the current 2020 expiration.
>
> 2. Simultaneous to ongoing negotiations with Vicastone, develop potential alternative suppliers to Vicastone for the production of Pental sku's currently produced by Vicastone.
>
> 3. Develop new relationships and seek potential JV or acquisition targets for the SIC production of Quartz products.

*Id.* at 469-70.  In addition, Mr. Johnson stated that Mr. Pental's "salary will remain at $250k." *Id.* at 469.   Mr. Johnson then forwarded this e-mail to Mr. Palakodati on January 9, 2019, who responded "Ty, Works for me. Thank you." *Id.*  Mr. Palakodati then prepared and issued an "ASG Supply Chain Update" announcing these and other Company changes that were distributed via e-mail on January 10, 2019, to the "Purchasing ASG" group of suppliers. *Id.* at 471, 473. The Update stated that "Peter Pental will transition from his natural stone procurement responsibilities into a strategic advisory role working closely with Myself and the SIC leadership team on Petal product growth initiatives."  Def.'s App. 473.   The Update also advised that Luke Spiller had left the Company to pursue other opportunities and thanked him for "his countless contributions over the years and wish[ed] him nothing but the best." *Id.*

On January 17, 2019, Mr. Pental responded to Mr. Johnson's "Recap" e-mail.  Def.'s App. 474.  Mr. Pental started out by recounting that, when Trive purchased his company PGM in 2017, he had the title of president of AGM, which was later named ASG. He continued by summarizing and criticizing the changes to his role in the Company that Mr. Palakodati had started implementing early on after the sale of PGM:

Very early on Sunil made it clear that I should let Jack Bramson take over more of the operation and I should step back a bit. I listened to his instructions and followed. As a result[,] I did not travel to branches and that allowed Jack Bramson to travel more. So my job duties were as follows[:]

1. buy stones for Pental brand
2. procurement of PentalQuartz
3. handle all issues regarding PentalQuartz which included claims where even though claims came to Jack, he would ask for my advice and we would make decisions.

I[n] December of 2017, without any prior information, Luke [Spiller] came in town and he wanted to take over the natural stones per Sunil's instructions, even though it was shocking as that was one of the 3 main things I was doing, I co-operated and helped Luke and Ramon with anything they needed.  After [a] few months that strategy faltered. Sunil asked me to step in and by the time I came in, we were out of some really well selling stones like Taj Mahal which is also known as Venus (ASG's name). I took over the stones and started placing orders.

Very recently there were phone meetings held regarding Pental natural stone procurement and I was not part of the meeting. I asked Sunil about it and requested that if he is intending to take away the stone procurement from me again, we should tell the suppliers. He finally admitted on the phone that yes that was the case.

I . . . also [learned from an] email that Ming Xu was hired to take over PentalQuartz.

*Id.* at 474.

Mr. Pental continued by expressing concern that all of the new assignments mentioned in Mr. Johnson's prior e-mail "seemed very temporary." *Id.* Mr. Pental acknowledged their agreement that his salary would remain the same ($250,000), but he noted that, "at one time you wanted to reduce my pay rate to $100,000 and ask[ed] me to work less. When I mentioned that I can do more and I would not want a pay cut, you mentioned that you would give me some more duties." *Id.* Mr. Pental, however, expressed the belief that the new duties "appear to be my walk to the door from where I will be pushed out" because "[i]n the meantime, I really don't have much to do." *Id.* He also complained that, when he went to the Seattle office, he was not involved in

any major decision making, and it felt as if the managers in that office had been "asked not to take any advice from me" and told to "run the [C]ompany without me." *Id.*

Mr. Pental advised that he was quite capable of performing his new duties while at the same time continuing to procure natural stones. He believed that allowing him to do both would save the Company money, unless he and Mr. Palakodati had already decided that they did not want him in the Company anymore because of his recent e-mail criticizing Mr. Palakodati. He explained that his recent criticism of Mr. Palakodati was made out of panic and sincere concern for the Company: "I just want you to know that when people were fleeing Pental Seattle and Sunil's name was coming up quite a bit, I got panicked and reached out to you for the best interest of our [C]ompany. I hope that my sincere attempt to help the [C]ompany will not be held against me." *Id.*

Mr. Pental concluded by restating that, while he was happy to take on new responsibilities as COO of SIC, he also wanted to continue doing his prior job and to be involved in management and operational decisions for ASG because he enjoyed working for ASG and wanted to continue to contribute to ASG, as well as SIC's success, even if it meant that he would have to "travel, work long hours," and do "anything that is needed." *Id.* at 475. In addition, he commented that he "would love to be part of the manager's meeting in Austin next month" and the "strategy that is taking place" even though he "was not told about any of these and was not invited to these meetings." *Id.*

Later that same day on January 17, 2019, Mr. Pental also e-mailed Mr. Palakodati to document a conversation they had earlier that day. In the e-mail, he expressed frustration with his new role in SIC and the changes in his job responsibilities (no longer being involved in natural stone procurement). Despite telling Mr. Johnson earlier that day that he was "happy to run the role

of COO" of SIC and to undertake his new responsibilities in that role, he told Mr. Palakodati that

he had not yet officially accepted the new position in SIC and expressed the opinion that it was

unfair to shut him out of his original role in natural stone procurement and operations:

> You mentioned that you were working on lots of new processes and systems. I asked you the reason for taking lots of my tasks away and implying to the Pental employees that they should not come to me for any question or help. I told you . . . I am good at what I do, I am one of the best in the country in selecting natural stones and I can do a lot to help the [C]ompany. I have not been invited to the tile strategy meeting in Austin, I have not been invited to the managers meeting in Austin[.] Your reply was that since I was transitioning out of the operation and I was going to be in advisory role to SIC, you wanted to keep me out of operations. You also mentioned that you were taking all the tasks away from me as in your opinion I was going to move on. . . . . Taking all tasks away from me is not fair and that is causing me a lot of stress and anxiety. I am at a point I am not able to sleep at night. It has ma[d]e my work environment very humiliating. You mentioned that I should take these issues to Ty directly, I mentioned that I did send an email to Ty [Johnson] but since my title is COO and officially I have not accepted any new role, as far as I know, I report to you as you are the president of combined entity.

*Id.* at 477.  Mr. Pental ended his e-mail by asserting that he "hop[ed] these recent changes [were]

not because of retaliation" as a result of him "reach[ing] out to Ty [Johnson] last year for [a] few

issues. I asked you if you thought I was in your way or [an] obstruction to your decision making

in operation[s] and your answer was no."  *Id.*

Five days later on January 23, 2019, Mr. Pental sent "an official e-mail," to Mr. Johnson

advising that "I won't be able to accept the new role" in SIC because: "Your item 1, as you know,

I have already been working on arranging the meeting between you, Sunil [Palakodati] and

[supplier] Vicostone that will turn in to the conversation of expanding the agreement," and "we

already have Jerry Salveson who is working on item 2 and 3 so you don't need me for that

position[.]"  *Id.* at 486-87.  He concluded by stating that he wanted to continue in the Company in

his current role and asked Mr. Johnson if he would "ask Sunil [Palakodati] and his team to include

[him] in all the KPI calls, operational meetings, manager meetings, strategy meetings as he

mentioned that it was your directive to take [him] out of operations." *Id.* at 487.  Mr. Pental also

expressed his surprise that any such directive came from Mr. Johnson rather than Mr. Palakodati

because he "had not accepted the new role yet."  *Id.*

On January 29, 2019, Mr. Johnson responded to Mr. Pental's e-mail and reiterated what

Mr. Pental's new role in the Company and SIC would entail and made clear that he would no

longer have his prior duties or be involved in ASG operational matters, but his compensation and

benefits would remain the same:

> I wanted to respond to your email regarding your role at SIC as we move
> further into 2019. As outlined to you in my earlier email, your new role will be that
> of consultant to myself regarding efforts around our sourced quartz product line.
> You will no longer have the role as COO of ASG, and will have no day to day
> operational responsibilities or decision making requirements, except as explicitly
> requested by myself or Sunil Palakodati.
>
> In your new role, you will not be required to come to any of the branch
> facilities, except when explicitly requested. In your new capacity, you will be
> working remotely.
>
> Per your employment agreement dated February 28, 2017, your same
> compensation and benefits will remain in effect.
>
> Please reach out directly to Shawn Baldwin should you have any further
> questions.

*Id.* at 486.

Around this same time, Mr. Pental was e-mailing Peter Pichette about hearing "rumors"

and "false information" that he was "moving on." *Id.* at 479. Greg Bassett, a member of the

Company's leadership team, was copied on the e-mail.  Mr. Pental advised Mr. Pichette that he

had not told anyone he was "leaving [the Company] or moving on"; and that "Greg brought it up

in the lunch meeting a couple of weeks ago." *Id.* at 479.  He, therefore, told Mr. Pichette that

"Greg can tell you where he heard [this] from" and asked Mr. Pichette if he could "please send a

companywide letter clarifying this?" *Id.*

**Memorandum Opinion and Order – Page 18**

On January 25, 2019, Mr. Pental also e-mailed himself to document a discussion he had with Melda Whitney:[10] "Spoke to Melda on January 24th evening . . . [who] mentioned that Sunil called Greg and she heard the conversation, Sunil told Greg that I . . . was not part of ASG anymore and that I was an independent consultant to Tyrone [Johnson] and Nadeem [Moiz]. I am surprised to hear this[,] as my check is still made by ASG . . . . I have not accepted a new role."[11] *Id.* at 483.

Five days later, Peter Pichette sent an e-mail on January 30, 2019, to a small group of people, including Mr. Palakodati, Tim Way, Greg Bassett, John Jones, Melda Whitney, Jesse Bogan, Kate Turner, Shannon Baker, Satish Kalala, Darrell Dreibrodt, Mike McCullough, and Tim Reed[12] with the "Subject: Peter Pental – CONFIDENTIAL TO YOU" that advised as follows:

> All, I have been advised by Ty Johnson that effective immediately, Peter Pental will no longer be acting in the capacity of COO and will be reporting directly to Ty/SIC focused on manufactured quartz strategy efforts.
>
> Peter has also been advised that this new role does not require him to be in any of our branches unless explicitly requested and that [in] this new role [he] will work remotely from all of our locations.
>
> I wanted to give you this heads up as part of the leadership team as an FYI.
>
> We will share this information as part of broader organizational changes after the Sales Leadership meeting next week in Austin.
>
> Given the sensitive nature of this change, PLS DO NOT FWD THIS EMAIL or DISCUSS until further notice.

---

[10] According to Defendant's evidence, Melda Whitney appears to be an ASG human resources employee or manager.

[11] At the time of this e-mail, Nadeem Moiz was the chief financial officer ("CFO") of SIC and reported to Mr. Johnson. The Co.'s App. 23.

[12] According to other evidence submitted by Defendant, at the time of this e-mail, Kate Turner was the senior manager of brand and product marketing for Pental Surfaces/AGM; Tim Way was the vice president of sales for AGM; Jesse Bogan was the vice president of operations for AGM and testified as the Company's Rule 30(b)(6) representative in this lawsuit; Darrell Dreibrodt was the vice president of finance for ASG; Tim Reed was the CFO of ASG. The titles of the others included in this e-mail are unclear, but it appears from the subject of the e-mail and the titles of the foregoing persons that it was limited to those in high level management positions at the Company.

*Id.* at 488.

On February 8, 2019, Mr. Pental's counsel provided the Company with written notice of what he believed was "Good Reason" for Mr. Pental's termination or resignation under section 5(d) of the Employment Agreement as a result of the Company's retaliating against him for expressing concerns about a "potential securities law violation" involving SIC before it went public. *Id.* at 498. The letter further notified the Company of Mr. Pental's "intent to terminate [his employment] for good cause effective March 15, 2019[,]" and "provide[d] notice, pursuant to Sections 5(d)(i) and (iii)" of his Employment Agreement regarding his intent to pursue claims for constructive discharge and retaliation under SOX. *Id.* at 497, 499. The letter also accused SIC of immigration fraud, but this accusation does not form the basis of any claim asserted by Mr. Pental in this action.  Finally, the letter indicates Mr. Pental's willingness to provide a complete release of all claims in exchange for one year's severance and a release from the noncompetition obligations in his Employment Agreement and Securities Purchase Agreement. *Id.* at 499.

Section 5 of Mr. Pental's Employment Agreement defines "Termination by Executive for Good Reason" as: (1) "[a]ny reduction by the Board of the Base Salary without Executive's consent, unless such reduction is part of a reduction of the salaries of all Company executives"; (2) relocation of the Executive's primary office fifty miles or more without consent; or (3) "any material breach of this Agreement by the Company." Def.'s App. 52. The Employment Agreement does not define "material breach."

The Company responded to the letter from Mr. Pental's counsel on March 14, 2019.  Def.'s App. 501-03.  The Company disagreed that Mr. Pental had "Good Reason" to terminate his employment because none of the contractual circumstances for him to terminate for "Good Reason" had occurred. The Company disputed counsel's assertion that it had retaliated against Mr.

Pental for reporting unlawful activities.  It also disagreed that this was a basis for him to unilaterally terminate his employment for "Good Reason."  The Company, instead, contended that any resignation or separation by Mr. Pental from the Company would be governed by Section 5(e) of his Employment Agreement and would be treated as a "Termination by Executive without Good Reason."  *Id.* at 501.  According to the Company, even assuming that Mr. Pental was excluded from some telephone calls and meetings, and removed from some job responsibilities, neither of these actions constituted a material breach of either of his employment agreements.

The Company also took the position, and continues to maintain in this lawsuit, that Mr. Pental is not entitled to severance pay, and the Company was not obligated under the Mr. Pental's Employment Agreement with Trive to pay him severance because he did not comply with section 5(g)'s requirement that he provide the Company with an executed "written release in a form reasonably acceptable to the Company," which it contends was a condition precedent to his entitlement to severance pay.  The Co.'s App. 122-23.  The Company, nevertheless, asserts that it was "more than willing to pay [Mr.] Pental severance in exchange for a release," but he refused to sign a "standard release" unless the Company also agreed to release him from the noncompetition obligations in his Employment Agreement, which the Company was not willing to do.  Pl.'s Reply 24.  The Company, therefore, contends that the February 8, 2019 letter and the fabrication of claims by Mr. Pental are nothing more than an improper attempt to renegotiate the terms of his Employment Agreement to leverage a severance payment and renege on his contractual noncompetition obligations.  *Id.*

To this, Mr. Pental's counsel countered that the Company's conduct and treatment of Mr. Pental on January 29, 2019, breached his Employment Agreement and resulted in his being constructively discharged:

>    In this case, the companies breached the Employment Agreement with Mr.
> Pental on January 29, 2019, when Tyrone Johnson, the Chief Executive Officer of
> SIC, constructively discharged Mr. Pental by removing him from his position as
> COO and an executive of SIC, removing his day-to-day operational duties and
> decision-making responsibilities, and expressly telling him not to report to work.
> Because SIC terminated Mr. Pental's employment without cause, it was required to
> provide him twelve months' severance.

*Id.* at 518. The reference to the actions taken by Mr. Johnson on January 29, 2019, appears to

pertain to the e-mail Mr. Johnson sent to Mr. Pental on January 29, 2019, after Mr. Pental advised

that he was officially rejecting the new role and responsibilities. This lawsuit followed on February

6, 2020.

On June 10, 2022, the Company moved for summary judgment on all four of the claims

asserted against it by Mr. Pental, which include: (1) retaliation in violation of section 806 of SOX;

(2) breach of the Employment Agreement (severance pay); (3) declaratory judgment deeming

section 6.1(c) of the Purchase Agreement illegal and unenforceable; and (4) declaratory judgment

deeming section 6 of the Employment Agreement illegal and unenforceable. *See* Def.'s Am. Ans.

& Counterclaims (Doc. 56).

The Company argues that it is entitled to summary judgment on Mr. Pental's SOX claim

because he cannot satisfy any of the elements of this claim. In addition, the Company asserts that

Mr. Pental's breach of contract claim fails because he admits that he did not satisfy the express

condition precedent in the contract that required him to provide a written release. Finally, the

Company contends that it is entitled to summary judgment on Mr. Pental's two claims for

declaratory judgment because the issue of whether he was precluded under either of his

employment agreements from providing documents to the Occupational Safety and Health Act

("OSHA") and the SEC is not contested by any of the parties and, therefore, does not present a

justiciable question.[13]   The court agrees that the Company is entitled to judgment as a matter of law on Mr. Pental's claims.

## II.      Motion for Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is

---

[13] After briefing on the Company's Motion was complete on July 22, 2022, Mr. Pental moved in September 2022 for leave to file a supplemental brief and evidence, which the court denied because it was filed quite some time after he allegedly received the discovery at issue in April 2022. It also appeared to be an improper attempt by him at getting the final word on a motion by an opposing party. Doc. 221. In addition, the court explained that, if Mr. Pental believed that an extension of time was needed to address these documents in responding to the Company's Motion, he should have filed a timely motion under Rule 56(d).  *Id.*

**Memorandum Opinion and Order – Page 23**

asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

III.     **Analysis**

A.     **Sarbanes-Oxley Retaliation Claim (Defendant's Count I)**

Mr. Pental contends that there was a concerted retaliatory effort to force him out of the Company and constructively discharge him after he reported to management in June and July 2018 that the Company or SIC had misrepresented SIC's financial condition in SEC filings by artificially inflating revenue in falsified accounting records in anticipation of SIC going public in 2018.  As indicated, this contention is based on the Company's accounting treatment of certain sales of MQ products to Bedrock in late 2017, which Defendant refers to as the "Bedrock Transactions."  Def.'s Am. Ans. & Counterclaims 25-26 (Doc. 56).

1.  **Applicable Law**

a.  **Legal Standard for SOX Retaliation Claims**

Under section 806 of SOX, the statute's civil whistleblower provision, publicly traded companies may not "discharge, demote, suspend, threaten, harass or in any other manner discriminate against an employee in the terms and conditions of employment" because of any protected whistleblowing activity. 18 U.S.C. § 1514A(a).  Section 806 protects a broad range of activities relating to corporate fraud, including providing information to federal agencies, Congress, or internally within the company, and filing, causing to be filed, testifying, participating in, or assisting in proceedings. *See* 18 U.S.C. § 1514A(a)(1)-(a)(2). Protected activity involves providing information that the employee "reasonably believes" constitutes a violation of federal mail, wire, bank or securities fraud (18 U.S.C. §§ 1341, 1343, 1344 and 1348), or a violation of any SEC rule or other provision of federal law relating to fraud against shareholders. *See* 18 U.S.C. § 1514A(a)(1).  SOX's "anti-retaliation provision covers employees who report fraud not only to

the SEC, but also to any other federal agency, Congress, or an internal supervisor." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 778 (2018) (citing 18 U.S.C. § 1514A(a)(1)).

The elements of a SOX retaliation claim are: (1) the employee engaged in protected activity; (2) the employer knew that the employee engaged in the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *Allen v. Administrative Rev. Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008). If the employee establishes these four elements, the burden shifts to the employer to prove "by clear and convincing evidence"[14] that it "would have taken the same unfavorable personnel action in the absence of that behavior." *Murray v. UBS Sec., LLC*, 601 U.S. 23, 24 (2024) (quoting § 42121(b)(2)(B)(ii)); *see also Allen*, 514 F.3d at 476 (same) (citation omitted). "This 'independent burden-shifting framework' is distinct from the *McDonnell Douglas* burden-shifting framework" that applies in Title VII cases. *Allen*, 514 F.3d at 476 (citations omitted).

SOX retaliation claims require an "adverse action" that the employer imposed on the employee. *Halliburton, Inc. v. Administrative Rev. Bd.*, 771 F.3d 254, 260 (5th Cir. 2014) (citation omitted). To constitute prohibited retaliation, the "adverse action" must be "materially adverse" as defined by the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), that is, "an action harmful enough that it well might have dissuaded a reasonable worker from engaging in statutorily protected whistleblowing." *Id.* (citation omitted); *Halliburton, Inc.*, 771 F.3d at 254-60. Although *Burlington Northern* was a Title VII retaliation case, the Fifth

---

[14] The "clear and convincing evidence standard is higher than the 'preponderance of the evidence' standard, common in civil cases, but not as high as 'beyond a reasonable doubt.'" *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995). Clear and convincing evidence is evidence that "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Id.* (citations and internal quotation marks omitted).

Circuit in *Allen* concluded that the standard applies equally to SOX retaliation cases. *Id.* (citing *Allen*, 514 F.3d at 476 n.2).

*Burlington Northern* altered the analysis of retaliation claims and rejected the approach taken by several circuits, including the Fifth Circuit, "that required plaintiffs to demonstrate an 'ultimate employment decision' [an action that affected the terms and conditions of employment] to satisfy the 'adverse employment action' element of a retaliation claim" in the Title VII context. *Grice v. FMC Techs. Inc.*, 216 F. App'x 401, 407 (5th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67). After *Burlington Northern*, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (citation omitted). The Court in *Burlington Northern* noted that the material adversity requirement reflects the importance of distinguishing between "significant" and "trivial harms. *Id.* at 68. The Court also noted that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996) (noting that "courts have held that personality conflicts at work that generate 'antipathy' and 'snubbing' by supervisors and co-workers" are not actionable).

The standard for judging material adversity is an objective one, which is applied from the perspective of a "*reasonable* employee." *Id.* at 68-69 (citations omitted). Application of an objective standard "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings" in the retaliation context as well as other Title VII contexts, including constructive discharge and hostile work environment. *Id.*;

*Halliburton, Inc.*, 771 F.3d at 260 (citation omitted). Application of an objective standard "separate[s] significant from trivial harms" by "filter[ing] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68). "[T]he standard is phrased in 'general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Melancon v. Lafayette Gen. Med. Ctr., Inc.*, No. 22-30704, 2023 WL 6621679, at *2 (5th Cir. Oct. 11, 2023) (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69) (footnote omitted).

"Context matters" because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships [that] are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (citation omitted). Thus, for example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. *Id.* (citation omitted). Additionally, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.*

Regarding the last element—that the protected activity was a "contributing factor" in the "adverse action"—the Fifth Circuit in *Allen* explained: "A contributing factor is 'any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Allen*, 514 F.3d at 476 n.3 (citations omitted). The Supreme Court recently clarified that an employee is not required to demonstrate "'retaliatory intent' on the part of the employer to show that his or her 'protected activity was a contributing factor in the adverse employment action'

under the anti-retaliation provisions of the Sarbanes-Oxley Act (18 U.S.C. § 1514A(a))." *Monden v. Consolidated Nuclear Sec., L.L.C.*, No. 23-10553, 2024 WL 1007458, at *3 (5th Cir. Mar. 8, 2024) (quoting *Murray*, 601 U.S. at 37). The Supreme Court in *Murray* went on to explain that evidence "an employer acted with retaliatory animus is one way of proving that the protected activity was a contributing factor in the adverse employment action, but it is not the only way." *Id.*

### b. Constructive Discharge Law

To establish constructive discharge, a "plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Lauderdale v. Texas Dep't of Crim. Just., Inst. Div.*, 512 F.3d 157, 167 (5th Cir. 2007) (quoting *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)); *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). Courts consider a variety of factors, including the following, which can be considered "singly or in combination," in determining whether a reasonable employee would feel compelled to resign:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not.

*Id.* at 297 (footnote and citations omitted).

A plaintiff need not prove that his employer "specifically intended to force his resignation, . . . but [c]onstructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Lauderdale*, 512 F.3d at 167 (citations omitted). Whether a reasonable employee would feel compelled to resign is an objective test. *Barrow*, 10 F.3d at 297 n.19. Whether the employee subjectively felt compelled to resign is irrelevant. *Id.* (citation omitted). The analysis, instead, focuses on whether "the cumulative effect" of the employer's actions made

working conditions "so intolerable that a reasonable person would have felt compelled to [retire]." *McCann v. Litton Sys., Inc.*, 986 F.2d 946, 952-53 (5th Cir. 1993) (concluding that "slight decrease in pay coupled with a loss of some supervisory responsibilities" was insufficient to constitute constructive discharge) (citations omitted).

Under Title VII, constructive discharge qualifies as an adverse employment action. *Brown*, 237 F.3d at 566 (remanding case for new trial on compensatory damages because jury's findings and combined award of damages supported claim of racial discrimination under Title VII but not constructive discharge). Likewise, under the Age Discrimination in Employment Act, a prima facie case of retaliation based on constructive discharge can be established through evidence that the plaintiff was subjected to a "constructive discharge adverse action." *See Katz v. Wormuth*, No. 22-30756, 2023 WL 7001391, at *8 (5th Cir. Oct. 24, 2023). Based on Tenth Circuit authority, Defendant contends that the same standard applies in SOX retaliation cases. Def.'s Resp. 33 (citing *Lockheed Martin Corp. v. Administrative Rev. Bd.*, 717 F.3d 1121, 1133-35 (10th Cir. 2013)). It is unclear whether the Fifth Circuit would similarly conclude that a constructive discharge qualifies as an adverse employment action in a SOX retaliation case such as this, but the court assumes for purposes of resolving the Company's summary judgment motion that it would.

### 2. Discussion

As indicated, the Company contends that Mr. Pental cannot raise a genuine dispute of material fact as to any of the elements of his SOX retaliation claim, but, even if he satisfies his burden in this regard, it is still entitled to summary judgment on Mr. Pental's SOX retaliation claim because it has come forward with clear and convincing evidence that it would have taken the same actions regardless of whether Mr. Pental allegedly engaged in protected whistleblowing activity.

**Memorandum Opinion and Order – Page 30**

Mr. Pental responds that he has an objective reasonable belief that the Company violated SEC Rules and Regulations, and he contends that Company (Mr. Palakodati and Mr. Johnson) took a number of targeted, materially adverse actions against him. He identifies the following actions, which he contends qualify as materially adverse actions that made his working conditions so stressful that he was forced to resign (constructively discharged):

(1) "[The Company] excluded him from Operating Review calls in late August 2018[.]";

(2) "[The Company] told Mr. Bramson not to trust Mr. Pental in late August or September 2018[.]";

(3) "[The Company] devised a plan to "find a permanent fix" to Mr. Pental's complaints of accounting fraud (clearly implying terminating him) on September 1, 2018," and "concocted a plan to 'exit' him on September 12, 2018[.]";

(4) "[The Company] fabricated false performance deficiencies on September 2, 2018," and subjected him to his first-ever performance review, in October 2018, which was critical of him[.]";

(5) "[The Company] threatened to reduce his salary by $150,000 and demote him[.]";

(6) "[The Company] removed his role leading stone procurement in mid-November 2018"; and "on January 8, 2019, [the Company] assigned him meaningless work that other employees had already completed[.]";

(7) "[O]n January 29, 2019, [the Company] removed his title as COO and all of his responsibilities; and told him not to report to work, but to play golf, instead[.]";

(8) "[I]n late January 2019, [the Company] cancel[]ed his one-on-one meetings with Mr. Palakodati and a business trip to Brazil[.]";

(9) "[The Company] instructed Mr. Bramson to terminate Mr. Pental[.]";

(10) "[The Company] issued veiled threats in November 2018[] that if he did not stop raising the MQ accounting issues, the Company would fire him[.]";

(11) "[The Company] told other employees that he was "moving on" from the Company, in mid-January 2019[.]"; and

> (12) "[The Company] drafted a severance agreement for [him] on or before January 4, 2019, which it refused to provide him in order to withhold his severance payment from him, in violation of his contract[.]"

Def.'s Resp. 32-33 (citations omitted).

To support his contention that the foregoing actions constitute materially adverse actions,

Mr. Pental asserts as follows:

> Courts have found that record evidence of similar materially adverse actions is sufficient to defeat summary judgment. *Lockheed Martin Corp. v. Admin. Rev. Bd.*, 717 F.3d 1121, 1133-35 (10th Cir. 2013) (constructive discharge under SOX is a materially adverse action); *see also Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (a demotion may be actionable, even if it does "not result in a decrease in pay, title, or grade"); *Malin v. Hospira, Inc.*, 762 F.3d 552, 561-62 (7th Cir. 2014) (a reasonable juror could conclude that employer retaliated by effectively demoting the employee); *Mitchell v. Univ. of La. Sys.*, 154 F. Supp. 3d 364, 405 (M.D. La. 2015) (denying summary judgment because employee "suffered a de facto demotion by being stripped of all meaningful job duties"); *Lee v. City of Corpus Christi*, 479 F. Supp. 2d 521, 541 (S.D. Tex. 2010) ("it cannot be said as a matter of law that the exclusion [from meetings was] not materially adverse"); *Reines v. Venture Bank*, 2005-SOX-112, at *55 (ALJ Mar. 13, 2007) ("diminution of Complainant's authority and responsibility" is a materially adverse employment action).

> Here, the Company's ostracism of [him], exclusion of him from meetings, spreading of rumors about him, fabrication of performance deficiencies, reduction of his responsibilities, demotion, attempt to decrease his salary by $150,000, and constructive discharge are all actions that "well might dissuade a reasonable employee from whistleblowing" and, therefore, are actionable under SOX. See *Halliburton*, 771 F.3d at 262.

Def.'s Resp. 33-34.[15] Mr. Pental argues that the Company engaged in a "pattern of retaliatory adverse actions," the timing and temporal proximity of which are sufficient to establish that the

---

[15] Other than his bullet point list of allegedly materially adverse actions and citations to evidence, this is the only reasoning that Mr. Pental provides in support of his assertion that he suffered a materially adverse action or actions as a result of him allegedly engaging in protected activity. These citations to authority and Mr. Pental's single corresponding global assertion that he uses in an attempt to tie the legal authority to the actions identified in his response are insufficient to explain why he believes that each of the actions constitutes a materially adverse action. As such, the briefing on this issue is inadequate and unhelpful. *See* L.R. 7.1(d) (requiring motions and responses to be "accompanied by a brief that sets forth the moving party's contentions of fact and/or law, *and argument* and authorities"); *see also* L.R. 56.1 ("Except as expressly modified, the motion practice prescribed by LR 7.1-7.3 is not affected by LR 56.2-56.7.").

actions were taken in retaliation for his reporting fraudulent financial accounting on two separate occasions to Mr. Palakodati in June 2018 and Mr. Johnson in July 2018. *Id.* at 37.

The Company replies and continues to contend that: (1) Mr. Pental's assertions are not evidence and not supported by the record; (2) the actions he complains of do not qualify as materially adverse actions and are insufficient to establish constructive discharge; and (3) the evidence he relies on does not establish that his alleged protected activity was a contributing factor in any allegedly unfavorable action. In addition, The Company argues that, even if the court concludes that Mr. Pental established a prima facie claim of retaliation under SOX, it is still entitled to judgment as a matter of law given its evidence that it would have made the same personnel decision to move him into a different role. In this regard, the Company asserts that, although Mr. Pental and Mr. Palakodati did not get along personally or professionally and were unable to work together without constant drama, Mr. Johnson believed that they were both valuable, knowledgeable, and good for the Company, and changed Mr. Pental's role in the Company so that he and Mr. Palakodati would no longer have to work together.

The court agrees that Mr. Pental has failed to present evidence that would raise a genuine dispute of material fact regarding the third element of his SOX retaliation claim—whether he suffered a materially adverse action. On their face, Mr. Pental's characterizations of the actions taken by the Company appear to qualify as materially adverse actions. In actuality, though, his account of these actions is inconsistent with the evidence he relies on, is not supported by competent summary judgment evidence, or both, and he does not adequately explain why the actions identified by him qualify as materially adverse actions from a factual or legal perspective. Alternatively, the court agrees that the Company has come forward with clear and convincing evidence that it would have taken the same actions regardless of whether Mr. Pental engaged in

protected activity. The court's analysis of Mr. Pental's retaliation claim, therefore, focuses on these two issues.

### a.  Whether Mr. Pental suffered a materially adverse action

#### i.      "[The Company] excluded him from Operating Review calls in late August 2018[.]"[16]

This assertion by Mr. Pental is based on messages posted on an electronic message board[17] in which he communicated with a former coworker on February 4 and 5, 2019, a few days before his attorney forwarded the demand letter to the Company on February 8, 2019, threatening to sue on his behalf for retaliation and constructive discharge.  In this exchange, Mr. Pental inquired about meetings or telephone calls that had occurred several months earlier:

> Mr. Pental: "Jack[,] I used to be on SIC operating review calls and then I was not invited anymore. Do you remember being on calls in the month of August and September before you left when I was not on those calls?"

> Jack Bramson: "Peter, I know I was on the calls pretty much up until I left. The SIC calls were sporadic with no fixed schedule. I recall scrambling to put together Power Point presentations for Sunil [Palakodati] . . . I'm pretty sure there was one in Sept[ember] around the time [o]f the first headcount reduction."

> Mr. Pental: "Do you recall me not being on the calls after August?"

> Jack Bramson: "I do remember[] wondering why you were not on them[,] but I didn't know you were uninvited."

> Mr. Pental: "Do you remember [i]f [the] calendar request would have said ASG operating review or SIC operating review?"

Def.'s App. 490.  Mr. Bramson's response to this last question is unclear from the evidence in this case.  According to evidence relied on by Mr. Pental to show that another alleged materially

---

[16] Def.'s Resp. 32 (citing Def.'s App. 490).

[17] *See* The Co.'s App. 108.

**Memorandum Opinion and Order – Page 34**

adverse action occurred, [18] there was a meeting scheduled to take place in September 2018 in which a reduction in force was an anticipated talking point, but this was an SIC meeting, not an ASG meeting. *See* Def.'s App. 418-19 (SIC power point presentation dated September 12, 2018).

For support that exclusion from meetings qualifies as an unfavorable personnel action, Mr. Pental relies on *Lee v. City of Corpus Christi*, 479 F. Supp. 2d 521, 541 (S.D. Tex. 2010), a Title VII retaliation case, for the conclusion that "it cannot be said as a matter of law that the exclusion [from meetings was] not materially adverse." Def.'s Resp. 33. Contrary to Mr. Pental's assertion, the foregoing exchange is not evidence that he was *excluded* from meetings or telephone conferences in late August 2018 or September 2018. At most, it shows that he was not included or did not participate in meetings or calls in September 2018 or after August 2018.

Moreover, unlike *Lee*, there is no evidence in the record to suggest that the alleged exclusion of Mr. Pental from one or more meeting made "fulfilling the obligations of [his] position" at that time more difficult. *See Lee*, 749 F. Supp. 2d at 541. In late August 2018, Mr. Pental was still acting as an executive or vice president for ASG or AGM. He had not yet transitioned to his new role in SIC, and there was no discussion at this time about him taking on a new role in SIC. It is also unclear whether the meeting alluded to by Mr. Bramson pertained to "ASG operating review *or* SIC operating review." Def.'s App. 490 (emphasis added). Mr. Pental apparently recognized the import of this distinction because he asked Mr. Bramson whether the meeting involved "ASG operating review or SIC operating review." *Id.* If it was an SIC meeting, there would have been no obvious need for him to participate. Additionally, Mr. Johnson testified that, when Mr. Pental brought the issue regarding a meeting to his attention, he did not understand

---

[18] *See infra* subsection (a)(iii).

**Memorandum Opinion and Order – Page 35**

why Mr. Pental would even be on that call "because frankly, [AGM] has nothing to do with quartz," whereas Mr. Pental "was kind of a quartz person." The Co.'s App. 108.

The timing of Mr. Pental's communication with Mr. Bramson also undermines any argument regarding the importance of his being able to attend this or other meetings around this time. There is no record of Mr. Pental expressing concern to Mr. Johnson, Mr. Paladokati, or anyone else about being excluded from ASG or ASG operations meetings before November 2018 when Mr. Johnson first talked to him about transitioning to a new role in SIC.[19] In addition, Mr. Pental waited until early February 2019—after he was allegedly constructively discharged on January 29, 2019, and only four days before his attorney sent a demand letter to the Company— to ask Mr. Bramson about this meeting or meetings that had occurred several months earlier in an obvious effort to gather evidence to support his constructive discharge and SOX retaliation claims.

It is also clear from Mr. Pental's numerous written communications between August 2018 and January 2019 that he was not afraid to express his opinions regarding Mr. Paladokati's leadership and business decisions or any other matter, including his concern about being excluded from future meetings. While the test is an objective one, Mr. Pental's conduct or inaction suggests that a reasonable employee in his position would not have been dissuaded from engaging in protected conduct. Thus, Mr. Pental's contention that he was excluded from operating review calls or meetings in late August 2018 and September 2018 is not supported by the evidence and amounts to no more than speculation that does not qualify as competent summary judgment evidence. *See Forsyth*, 19 F.3d at 1533. As such, it is insufficient to show that he suffered a materially adverse action that might dissuade a reasonable employee from engaging in protected activity.

---

[19] It is not clear whether Mr. Johnson's deposition testimony concerns the same meeting. Assuming that it does, it is not clear when this discussion took place, *see* Pl.'s App. 108, and Mr. Pental does not assert that he brought this issue to Mr. Johnson's attention or point to any evidence of when he did bring it to Mr. Johnson's attention.

        ii.        **"[The Company] told Mr. Bramson not to trust Mr. Pental in late August or September 2018[.]"[20]**

To support this assertion, Mr. Pental relies on the same electronic communications that he exchanged with Mr. Bramson on February 4 and 5, 2019, to show that the Company told Mr. Bramson not to trust him.  In this regard, Mr. Bramson stated: "Also, remember I shared with you that Sunil [Palakodati] told me that the only people I could trust in the company were him, Tim Way[,] and Jesse. That was when I was with him in Vegas at Tuscany which was in either August or September." Def.'s App. 490.

Contrary to Mr. Pental's assertion, Mr. Bramson does not state in this electronic message that the Company, or even Mr. Palakodati, told him or others that Mr. Pental could not be trusted. While it is apparent from other e-mails by Mr. Palakodati that he considered AGM managers Tim Way and Jesse Bogan to be "proven leaders," who he could trust and rely upon to accomplish business goals and fix problems, *see* Def.'s App. 416, this statement by Mr. Palakodati to Mr. Bramson, without more, does not support the inference urged by Defendant—that the Company "told Mr. Bramson not to trust Mr. Pental" and ostracized him. Def.'s Resp. 32. Thus, this unsubstantiated assertion or inference, which is not supported by the record, *see id*., does not constitute competent summary judgment evidence and is insufficient to establish that Mr. Pental suffered a materially adverse action that might dissuade a reasonable employee from engaging in protected activity. *See Forsyth*, 19 F.3d at 1533.

---

[20] Def.'s Resp. 32 (citing Def.'s App. 490).

**Memorandum Opinion and Order – Page 37**

               **iii.**     **"[The Company] devised a plan to "find a**
                         ***permanent* fix" to Mr. Pental's complaints of**
                         **accounting fraud (clearly implying terminating**
                         **him) on September 1, 2018," and "concocted a**
                         **plan to 'exit' him on September 12, 2018[.]"[21]**

Once again, this assertion by Mr. Pental does not accurately characterize the evidence on which he relies. The evidence reflects that Mr. Palakodati's reaction and statement on September 1, 2018—"Ty—Quite frustrating that I am getting dragged into their [Ravi and Peter Pental's] stuff. Let's definitely talk and find a permanent fix or else this will not go away"—came on the heels of being notified that Mr. Pental had e-mailed human resources on August 31, 2018, and filed a formal complaint against Mr. Palakodati because he believed that Sunil had interfered in a personal family matter involving him, his brother Ravi Pental, and his family in India. Def.'s App. 414.

Mr. Pental's contention that the Company "concocted a plan to 'exit' him on September 12, 2018," is similarly based on conjecture. Def.'s Resp. 33 (citing Def.'s App. 419). The document dated September 12, 2018, that he relies on is a portion of an SIC power point presentation titled: "ASG: Headcount Reductions–Synergy & Investment Optimization." Def.'s App. 418-19. The first page of the presentation is titled "ASG: Headcount Reduction," which does not specifically reference Mr. Pental or anyone by name. Moreover, this presentation indicates that the plan was a company-wide reduction in force that included "the exit of certain founders" but was not limited to founding members or the persons (Mr. Pental and Luke Spiller) who had allegedly engaged in protected activity. *Id*. at 419. Such conclusion is consistent with other evidence of company-wide employee layoffs and terminations in the fall of 2018, as reflected in Mr. Pental's written complaints and vocal opposition to such management decisions by Mr.

---

Palakodati, and the electronic message board communications between Mr. Pental and Mr. Bramson on February 4 and 5, 2019.

Regardless, Mr. Pental does not argue or point to any evidence that he was aware of Mr. Palakodati's September 1, 2018 e-mail or the SIC power point presentation before they were produced during discovery in this litigation. When deposed, even Mr. Pental's brother Ravi testified to not hearing any gossip or being personally aware of the reduction-in-force referenced in Mr. Palakodati's e-mail either generally or with respect to Mr. Pental and other founders. *See* Def.'s App. 742.

"Logically, a reasonable worker cannot be dissuaded by a decision or action of which he is not aware." *Estate of Oliva v. New Jersey*, 579 F. Supp. 2d 643, 676 (D. N.J. 2008); *see also Gray v. Foxx*, 74 F. Supp. 3d 55, 71-72, 2014 WL 5823090 (D.D.C. 2014), ("Gray could not have been dissuaded from pursuing her charge of discrimination by an action of which she was wholly unaware until, presumably, well into the formal complaint process. On such grounds alone, the Court cannot find that the emails in question qualify as retaliatory actions."); *Jumbo v. Dolgencorp of Tex. Inc*, No. 4:15-CV-1451, 2017 WL 4475932, at *10 (S.D. Tex. Sept. 30, 2017) ("Plaintiff complains that Ejiogu retaliated against him by excessively monitoring his store. . . . [E]ven if Ejiogu was excessively monitoring the store, Plaintiff did not know about the monitoring before January 7, 2014. Because Plaintiff was unaware of the monitoring, the monitoring could not have dissuaded him from making a charge of discrimination and, therefore, was not materially adverse."); *Brown v. Vanguard Group, Inc.*, 2017 WL 412802, at *17 (E.D. Pa. Jan. 30, 2017) ("Plaintiff also lists other employment actions that do not qualify as adverse employment actions for purposes of her retaliation claims. . . . Chigullapalli's March 12, 2014 message to Sabin, notifying him of Plaintiff's performance deficiencies was . . . not materially adverse because

Plaintiff was not aware that it was sent, and thus it could not have dissuaded a reasonable worker from making a claim of discrimination."); *Odom v. Holder*, No. 2:11-CV-3086-SLB, 2014 WL 1233709, at *17 (N.D. Ala. Mar. 25, 2014) (quoting *Estate of Oliva*, 579 F. Supp. 2d at 676).

Given the lack of evidence that Mr. Pental was aware of Mr. Palakodati's September 1, 2018 e-mail or the SIC power point presentation, the undersigned likewise determines that the statements and information in the September 1, 2018 e-mail and SIC power point presentation dated September 12, 2018, are insufficient to raise a genuine dispute of material fact whether a reasonable employee might have been dissuaded as a result of these communications from engaging in protected activity as required for a materially adverse action and SOX retaliation claim. Additionally, as noted, the evidence does not support the inferences urged by Mr. Pental.

> iv.    **"[The Company] fabricated false performance deficiencies on September 2, 2018," and subjected him to his first-ever performance review[] in October 2018, which was critical of him[.]"[22]**

Mr. Pental again relies on Mr. Palakodati's September 2, 2018 e-mail to Mr. Johnson and response to his human resource's complaint concerning the personal matter to support his contention that the Company "fabricated false performance deficiencies." Def.'s Resp. 33 (citing Def.'s App. 415-1, 416). In expressing his surprise to the complaint, Mr. Palakodati states that he provided "some of the key founders" with "significant responsibilities in ASG," and "several key people did not meet their commitments" in the first quarter of 2018. Def.'s App. 415-1. He did not, however, mention Mr. Pental by name or identify any deficiencies in his performance. Instead, he indicated that he would send Mr. Johnson the specific goals that were laid out earlier that year.

Later that same day, Mr. Palakodati followed up with another e-mail to Mr. Johnson (Def.'s App. 416). In this e-mail, Mr. Palakodati indicated that Mr. Pental missed certain goals that were

---

[22] Def.'s Resp. 33 (citing Def.'s App. 415-1; 416; 688:7-18; 784:17-785:2).

**Memorandum Opinion and Order – Page 40**

laid out to key leaders in early 2018 and took the position that Mr. Pental's performance in handling the Northeast market had affected the Company:

> Our major miss continues to be NE which Peter drove the investments (inventory, marketing spend[ing]) but no results. Recent Vicastone threat for loss of potential exclusivity is related to lack of purchases related to NE sales growth. I had to move the territory to my proven leaders Tim Way and Jesse Bogan recently to fix it.

*Id.*

Nothing in this e-mail or the other evidence cited by Defendant, however, supports Mr. Pental's assertion that the statement by Mr. Palakodati in this September 2, 2018 e-mail regarding his performance was false or fabricated. Additionally, as before, there is no evidence that Mr. Pental was aware, before this lawsuit was filed and the parties exchanged discovery, that this private communication had taken place between Mr. Palakodati and Mr. Johnson, so it begs the question of how he or a reasonable employee might have been dissuaded as a result the communication from engaging in protected activity as required for a SOX retaliation claim.

The remaining evidence relied on by Defendant (Def.'s App. 784:17-785:2) pertains to a performance review of Luke Spiller, not Mr. Pental, so it is not relevant to whether Mr. Pental suffered a materially adverse action. Moreover, according to Mr. Spiller's deposition testimony, it was the type of review in which he was asked to evaluate his own performance:

> [I]t was my first ever formal review where you're actually checking boxes and saying if you did well or good, et cetera; and if I remember, on that review I even wrote, hey, I don't recall any of these even being my tasks for the year. So I'm going to have to put I did not do well on this task.

*Id.* at 784-85. Thus, this evidence similarly fails to support Mr. Pental's assertion that he received his first ever performance evaluation in retaliation for allegedly engaging in protected activity.

The Factual Background section of Defendant's summary judgment response also includes a citation to an e-mail by Luke Spiller on October 11, 2018, to Mr. Pichette (Def.'s App. 425-27).

In this e-mail, Mr. Spiller acknowledges that some business initiatives involving him, Mr. Pental, and others "may or may not have been achieved" on various fronts, and he agrees that other business efforts were outright failures. *Id.* at 427. Mr. Spiller attempts to provide a forensic analysis of what he thinks went wrong. He attributes some shortfalls involving Mr. Pental to sales being slow after Mr. Pental procured and increased inventory in August 2018. *Id.* He also concludes that some failures might require a team effort to drill down on and learn more to understand what went wrong. *Id.*

Again, however, this evidence does not demonstrate, as Mr. Pental contends, that any reviews of his performance were falsified or fabricated; nor does it show that *he* was "subjected . . . to his first-ever performance review[] in October 2018" that was critical of his performance. Def.'s Resp. 33. Instead, it substantiates Mr. Palakodati's assessment of Mr. Pental's performance in relation to sales. Accordingly, this and the other evidence cited by Defendant is insufficient to establish a genuine dispute of material fact as to whether he suffered a materially adverse employment action as required for a SOX retaliation claim. *See Credeur v. Louisiana*, 860 F.3d 785, 798 (5th Cir. 2017) (holding that criticism of employee's work and threats of termination for failure to comply with performance improvement expectations amounted to no more than "[c]hastisement by superiors," which "'do[es] not rise to the level of material adversity' that distinguishes an adverse employment action from 'petty slights, minor annoyances, and simple lack of good manners' that the Supreme Court has recognized are not actionable retaliatory conduct") (citations omitted); *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286 (5th Cir. 2015) (explaining that unfavorable performance reviews are not adverse employment actions when colorable grounds exist for disciplinary action) (citing *Burlington N. & Santa Fe Ry. C*o., 548 U.S. at 68) (footnote and other citations omitted).

     v.     **"[The Company] threatened to reduce his salary by $150,000 and demote him";[23] "[the Company] removed his role leading stone procurement in mid-November 2018";[24] "on January 8, 2019, [the Company] assigned him meaningless work that other employees had already completed";[25]** and **"on January 29, 2019, [the Company] removed his title as COO and *all* of his responsibilities; and told him not to report to work, but to play golf, instead."[26]**

Each of these points pertains to the discussions between Mr. Pental and Mr. Johnson that began after the Atlanta meeting in November 2018 regarding the proposed changes to Mr. Pental's title and role in the Company shortly after he complained to Mr. Johnson and human resources about Mr. Palakodati's management style and meddling and suggested that Mr. Palakodati be moved to the RDS side of the Company. Mr. Pental contends that evidence regarding such changes supports his argument that he was demoted in retaliation for reporting alleged accounting fraud in connection with SIC going public.

The Company counters that: (1) the evidence shows that Mr. Pental was promoted, not demoted; (2) his salary was not reduced; (3) there is no evidence his responsibilities were reduced or that he was assigned menial or degrading work; (4) he has presented no legally significant evidence of badgering, harassment, or humiliation calculated to encourage resignation; and (5) there was no offer of early retirement or employment on less favorable terms.

First, Mr. Pental contends that the Company "*threatened* to reduce his salary by $150,000 and demote him." Def.'s Resp. 33. The word "threaten" suggests the use of pressure through

---

[23] Def.'s Resp. 33 (citing Def.'s App. 445-48; 450 § 3(a)).

[24] Def.'s Resp. 33 (citing Def.'s App. 437).

[25] Def.'s Resp. 33 (citing Def.'s App. 469-70; 474-75; 486-87).

[26] Def.'s Resp. 33 (citing Def.'s App. 486; 719:15-23; 721:21-722:10).

**Memorandum Opinion and Order – Page 43**

intimidation.  The e-mail communications between Mr. Pental and Mr. Johnson in which the two discussed, proposed, and negotiated the changes to his Employment Agreement, however, do not substantiate Mr. Pental's contention that he was "threatened."  Instead, Mr. Johnson initially proposed a salary of $100,000, to which Mr. Pental countered with a salary of $450,000, and Mr. Johnson then agreed to $250,000, after Mr. Pental advised that this was his current salary, and he was unwilling to take a pay cut.  At one point, Mr. Johnson even stated that his proposal was "not intended to upset [Mr. Pental]," and he was "[n]ot sure why this [wa]s awkward for [him]." *Id.* at 446-47. The two even exchanged holiday pleasantries.  *Id*. at 445 (Mr. Pental: "Ty . . . Merry Christmas. Enjoy the Amarone wine I sent you. Let me know how you like it[.]" Mr. Johson: "Will do. Open for 24 hrs and let it breathe first correct?" Mr. Pental: "Correct.").

Even assuming that this exchange qualifies as a "threat," the court determines that a purported threat of this kind would not dissuade a reasonable employee from engaging in protected activity because it is undisputed that, as result of the aforementioned discussion and negotiations, Mr. Pental's salary was not reduced.  It remained the same.  *See Brandon v. Sage Corp*., 808 F.3d 266, 271 (5th Cir. 2015) ("We do not reject the possibility that a realistic, drastic pay cut threat might deter someone from supporting a discrimination charge in certain circumstances, but no reasonable jury would find that to be the case here" because "Brandon has not provided specific evidence suggesting that a decision to reduce her salary was ever made," and the coworker who threatened the pay cut lacked authority to reduce the plaintiff's pay.) (footnote omitted).

Mr. Pental's contention that he was demoted, that his role and title in the Company changed, and that he was assigned meaningless work are likewise unsupported by the evidence in this case.  He asserts that he was demoted, but his pay remained the same, and the change in his title resulted in his being similarly situated to Mr. Palakodati in that both reported to Mr. Johnson

directly, whereas Mr. Pental previously reported to Mr. Palakodati.  Thus, the only real change was to Mr. Pental's role and responsibilities.  There is no evidence, however, that his new role and responsibilities were "viewed as more arduous or less prestigious." *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008) (citing *Burlington N. & Sant Fe Ry. Co.*, 548 U.S. at 71).

It is apparent from the e-mails exchanged between Mr. Pental and Mr. Johnson that Mr. Pental would have preferred that his title, role, and responsibilities remain the same, and that changes be made instead to Mr. Palakodati's role in the Company. The reassignment of job duties, though, is not automatically actionable and subjective preferences such as this do not qualify as materially adverse actions because the standard is an objective one. *Aryain*, 534 F.3d at 485 (citing *Burlington N. & Sant Fe Ry. Co.*, 548 U.S. at 71). Instead, whether a reassignment qualifies as materially adverse "depends upon the circumstances of a particular case." *Burlington N. & Sant Fe Ry. Co.*, 548 U.S. at 71.

Mr. Pental, however, points to no evidence from which the court can assess the materiality of the circumstances surrounding the changes in his role and responsibilities and how, if at all, this affected him, and his conclusory unsupported assertion and subjective belief that he was given "meaningless work" is insufficient to raise a genuine dispute of material fact regarding this issue. *See Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 269 (5th Cir. 2015) ("[W]hether an employment action is materially adverse is an objective query, and here Jenkins relies solely on his subjective impressions for support. . . . Thus, while Jenkins clearly coveted the role of District Chief of Inspections, his subjective preference is not enough to make his non-selection materially adverse.") (citations omitted); *Barnett v. Boeing Co.*, 306 F. App'x 875, 881 (5th Cir. 2009) ("Barnett fails to establish . . . how assignment to the MTI project is a materially adverse employment action. Barnett does not present evidence that the project assignment involved any

sort of demotion of responsibility, pay, or was associated with any stigma. Workers are often assigned to work on various projects within the scope of their employment. The assignment required Barnett to work with Baysinger, but that alone does not permit a determination that the assignment is an adverse employment action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.").

> vi.   **"[I]n late January 2019, [the Company] cancel[]ed his one-on-one meetings with Mr. Palakodati and a business trip to Brazil[.]"[27]**

Mr. Pental next argues that the Company's cancellation of a business trip and his meetings with Mr. Palakodati constitute materially adverse actions. The court addresses each contention and Mr. Pental's related evidence separately.

To support his assertion that, in late January 2019, the Company canceled his business trip to Brazil in retaliation for his engaging in protected activity, Mr. Pental relies on an e-mail he sent to Dhruv Agarwal on January 25, 2019, with the Subject "Change of Plans," in which he merely states: "Dhruv . . . My visit to Bra[z]il got canceled so I can meet earlier if you like[.] Def.'s App. 485.

It is not readily apparent from this e-mail who canceled the business trip, when the business trip was canceled, or why the business trip was canceled, that is, for business or personal reasons. Likewise, Mr. Pental's response to the Company's Motion does not explain why this is evidence of a materially adverse action, or why he believes the cancellation of this trip was attributable to his allegedly engaging in protected activity in June and July 2018, six to seven months earlier. It is not even apparent from the context of this e-mail whether the cancellation of this trip may have been related to Mr. Johnson's decision to change Mr. Pental's role in the Company because it is

---

[27] Def.'s Resp. 33 (citing Def.'s App. 485; 500).

unclear when the trip was canceled.  Additionally, it is not clear whether the cancellation of this business trip made "fulfilling the obligations of [his] position" more difficult.  *See Lee*, 749 F. Supp. 2d at 541.  As previously noted, "[c]ontext matters" in determining whether an action is materially adverse. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69.  Absent additional evidence to put the cancellation of the business trip in context, the court lacks sufficient information to evaluate whether this "might well dissuade a reasonable employee from whistleblowing." *See Halliburton, Inc.*, 771 F.3d at 262.

To support his assertion that, in late January 2019, the Company canceled his one-on-one meetings with Mr. Palakodati, Mr. Pental relies on a screenshot of an electronic calendar entry that includes the following information:

"Colleen West on behalf of Sunil Palakodati"

"Canceled: Peter Pental Weekly 1:1 Alignment"

 "When[:] Occurs every Monday effective 1/20/19" from 2:00 pm to 2:30 PM."

"Location[:] Peter to call Sunil"

"Canceled: Weekly Pental Branch Update . . . Skype Meeting: Sunil Palakodati"

Def.'s Resp. 33 (citing Def.'s App. 500).

According to this calendar entry, the meetings were only "[t]o be scheduled as needed." Def.'s App. 500.  Moreover, the timing of this calendar entry undermines the significance attributed to it by Mr. Pental.  The calendar entry does not reflect that the weekly meetings were canceled in January 2019, and it is not clear when the meetings were canceled; rather, this calendar entry merely indicates that the weekly meetings were not scheduled to start until January 20, 2019. Consequently, these meetings could have been canceled after Mr. Pental's counsel provided the Company with written notice on February 8, 2019, of Mr. Pental's termination or resignation. The

only other date on this calendar entry is February 26, 2019, which is after Mr. Pental's counsel sent a demand letter to the Company. In other words, the court has no way of verifying from this calendar entry when these meetings were canceled.  Without such context, the calendar entry is meaningless in determining whether the cancellation of the meetings was materially adverse as Mr. Pental contends.  Further, as with Mr. Pental's assertion regarding the business trip, his response to the Company's Motion includes no other information or explanation why he believes: (1) this calendar entry supports his argument that his meetings with Mr. Palakodati were canceled in January 2019; and (2) this evidence raises a genuine dispute of material fact as to whether this was a materially adverse action by the Company that "might well dissuade a reasonable employee from whistleblowing." *See Halliburton, Inc.*, 771 F.3d at 262.

### vii.    "[The Company] instructed Mr. Bramson to terminate Mr. Pental[.]"[28]

To support his assertion that the Company or Mr. Palakodati instructed Mr. Bramson to fire him in September 2018, Mr. Pental relies on the deposition testimony of his brother Ravi. Ravi Pental testified as follows regarding this issue:

> Q.     Now, did you know that there was consideration of firing all of the founders in this company at this point in time?
>
> A.     Yes.
>
> . . .
>
> Q.     And so you knew, by September 2nd, 2018, that there were plans to get you, Peter, Luke, and Byron Dougherty out of the company?
>
> A.     Yes. I heard from one . . . person, CEO, Jack [Bramson], he told me that Sunil told [him], make sure you fire all these guys. And Jack said, no, I cannot do that. They are good people. They are the founder[s]. They work very hard. So Jack left the company. And Jack said, I cannot do this to Ravi and Peter.

---

[28] Def.'s Resp. 33 (citing Def.'s App. 741:18-742:4).

> Q.      But you knew . . . when you hear this, that Sunil wanted to do this.
>
> A.      Yes, I heard that.

Def.'s App. 741-42.

The Company replies that this and other assertions by Mr. Pental are not supported by the evidence, and his assertions are insufficient to support his claims. The Company further asserts that rumors about an employee and "disparaging comments" or "idle threats" such as this do not constitute material adverse actions. The Co.'s Reply 17 (quoting *Boyd v. Dallas Area Rapid Transit*, No. 3:18-CV-1326-L-BH, 2018 WL 7265377, at *8 (N.D. Tex. Dec. 31, 2018)).

The Company is correct. Mere threats of termination have been held by the Fifth Circuit to be insufficient to support a claim of retaliation. *Chancey v. BASF*, No. 23-40032, 2023 WL 6598065, at *2-3 (5th Cir. Oct. 10, 2023), *cert. denied sub nom.*, 144 S. Ct. 1060 (2024) (citing *Credeur*, 860 F.3d at 798).

Moreover, the evidence relied on by Defendant is inadmissible double hearsay.[29] Under the Federal Rules of Evidence, "[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." *Ramirez v. Gonzales*, 225 F. App'x 203, 210-11, 2007 WL 329207, at *6-7 (5th Cir. 2007) (quoting Fed. R. Evid. 805). While the purported statement between Sunil and Mr. Bramson *might* be admissible as an admission by a party opponent under Federal Rule of Evidence 801(d)(2)(D) if Mr. Bramson were to testify,[30] the conversation between Ravi and Mr. Bramson

---

[29] Under the Federal Rules of Evidence, hearsay, defined as any statement not made by a person while testifying in the current trial or hearing that is offered as evidence to prove the truth of the matter asserted, is inadmissible unless an exception applies. Fed. R. Evid. 801, 802. The Company did not object to this evidence by Mr. Pental on the ground that it is inadmissible hearsay. In ruling on a summary judgment motion, however, district courts may *sua sponte* exclude or decline to consider incompetent hearsay evidence even in the absence of an objection by the opposing party. *Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012).

[30] The court emphasizes "might" because for the conversation between Mr. Bramson and Sunil to qualify as nonhearsay under the party opponent exception to the hearsay rule, there would also need to evidence that Mr.

**Memorandum Opinion and Order – Page 49**

in which Mr. Bramson told Ravi that Sunil told him to fire all of the founders does not fall within this or another hearsay exception because Mr. Pental does not contend, and there is no evidence that Mr. Bramson was involved in the alleged decision to constructively terminate his employment. *Ramirez*, 225 F. App'x at 210-11 ("Hohle's remarks to Longoria would probably fall within the party opponent exception. However, Longoria's comments to Walker do not fall within the party opponent exception because they concerned matters outside the scope of her employment, since Longoria was not involved in the decision to terminate Ramirez.") (citing Fed. R. Evid. 801(d)(2)(D)); *see also Holloway v. Department of Veterans Affairs*, 309 F. App'x 816, 819 (5th Cir. 2009) ("Since *Burlington Northern*, this court and others have considered various factors that weigh against a finding of "material adversity." Among these, we have explained that when a supervisor makes a challenged comment not to the plaintiff-employee but to his co-workers, the comment's hearsay nature "militates against a finding of materiality.") (citations omitted).

Additionally, evidence that Sunil told Mr. Bramson to fire *all of the founders* undermines Mr. Pental's contention that this threat was made in retaliation for his engaging in protected activity because there is no evidence that his brother Ravi, one of the Company founders, engaged in protected activity. Defendant also fails to point to any evidence that he was aware that Mr. Palakodati had told Mr. Bramson to fire any of the founding members. Accordingly, Mr. Pental's evidence regarding Mr. Palakodati's threat to terminate him and other founders in September 2018 is insufficient to establish that he suffered a materially adverse action by the Company.

---

Palakodati was one of the decision makers who was involved in the alleged constructive discharge of Mr. Pental's employment. *See Ramirez*, 225 F. App'x at 210-11 (citing Fed. R. Evid. 801(d)(2)(D)). The evidence in this case indicates that Mr. Palakodati was aware of Mr. Johnson's decision to change Mr. Pental's role and responsibilities in the Company, but there is no evidence Mr. Palakodati was involved in this decision by Mr. Johnson.

**Memorandum Opinion and Order – Page 50**

> ### viii. "[The Company] issued veiled threats in November 2018[] that[,] if he did not stop raising the MQ accounting issues, the Company would fire him[.]"[31]

This contention pertains to the November 2018 meeting that took place in Atlanta a short time after Mr. Pental complained to Mr. Johnson about Mr. Palakodati's management and suggested that Sunil be moved to RDS. Around this same time, Luke Spiller had filed a complaint about Sunil, and Sunil, in response to another complaint by Mr. Pental, told Mr. Johnson that Mr. Pental and other founding members had not met certain business goals in the first quarter of 2018.

To support his contention that the Company made "veiled threats" to fire him if he did not stop raising the MQ accounting issues, Mr. Pental relies on his sworn discovery responses to the Company's First Set of Interrogatories, in which he states as follows:

> Mr. Johnson told [him] and Mr. Spiller that they needed to work well with Mr. Palakodati, or [he] would terminate their employment. Mr. Johnson's statement was a thinly veiled threat to fire [him] if he did not stop raising issues about the accounting of the Bedrock Sale. In response, [he] told Mr. Johnson that he (Mr. Pental) had a duty to notify Mr. Johnson about facts regarding SIC's operations.

Def.'s App. 5. Mr. Pental also relies on his deposition testimony. *See* Def.'s Resp. (citing Def.'s App. 732:13-23).

Mr. Pental's sworn interrogatory response that "Mr. Johnson's statement was a thinly veiled threat to fire [him] if he did not stop raising issues about the accounting of the Bedrock Sale" is conclusory and not substantiated by his own description of the threat—that he and Luke Spiller would be fired if they could not get along and work well with Mr. Palakodati. Def.'s App. 732:13-23. Mr. Pental's interrogatory response that "[he] told Mr. Johnson that he (Mr. Pental)

---

[31] Def.'s Resp. 33 (citing Def.'s App. 5; 732:13-23).

**Memorandum Opinion and Order – Page 51**

had a duty to notify Mr. Johnson about facts regarding SIC's operations" is too vague in that it could equally apply to unprotected activity involving SIC's operations. *Id.*

This interrogatory response is also inconsistent with Mr. Pental's deposition testimony, which does not support his assertion that the Company or Mr. Johnson threatened to fire him in retaliation for raising MQ accounting issues. Specifically, there is no indication from Mr. Pental's deposition testimony or other evidence of this meeting that Mr. Pental was singled out or that Mr. Johnson expressly threatened him for previously engaging in allegedly protected activity. *See Muttathottil v. Gordon H. Mansfield*, 381 F. App'x 454, 458 (5th Cir. 2010) (concluding that the evidence relied on by the plaintiff was insufficient to satisfy his burden of showing that he suffered a material adverse action because "both Muttathottil and JT were warned against future disruptive or unprofessional behavior in the workplace; Muttathottil was not singled out. Wooten made no express threat of reprisal for Muttathottil's EEO activity, and he suffered no job loss, suspension, salary reduction, reduction of job duties, or any other form of discipline by Wooten."). To the contrary, Mr. Pental testified in his deposition that *Mr. Johnson told him, Luke Spiller, and Mr. Palakodati that he would let one or all of them go from the Company if they could not find a way to work together.* Def.'s App. 732. Mr. Johnson and Mr. Palakodati testified similarly in their depositions that the purpose of this meeting was to address the dysfunctional working relationships between Luke Spiller, Mr. Pental, and Mr. Palakodati and the consequences if they were unable to get along. The Co.'s App. 101-04; *see also* Def.'s App. 689-90.

Additionally, Mr. Pental relies on the following testimony from his deposition regarding the Atlanta meeting:

Q.      And at the end of this discussion, what did Mr. Johnson say?

A.      The conclusion of that meeting was that either we find a way to work together or Mr. Johnson would let one or all of us go from the [C]ompany.

Q.      And how did you perceive what Mr. Johnson said at the end of this meeting?

A.      My perception at the end of this meeting was that this because the [C]ompany where if you try to do the right thing, you are risking your job.

Q.      And did you say anything of that nature to Mr. Johnson?

A.      I said that . . . not in exact words, but I said that I hope that I did the right thing.

Def.'s App. 732.

This testimony, and in particular the last statement by Mr. Pental, is just as vague as what he claims in his interrogatory response to have said about having a duty to notify Mr. Johnson about SIC's operations.  Notably, Mr. Pental made a similar comment to Mr. Johnson in an e-mail on January 17, 2019, in which he expressed the opinion that he wanted to continue in his current role unless he and Mr. Palakodati had already decided that they did not want him in the Company anymore *because of his recent e-mail criticizing Mr. Palakodati's management*. Def.'s App. 474. He explained that he only reached out to Mr. Johnson to *complain about Sunil* in the "best interest" of the Company, and indicated that "I hope that my sincere attempt to help the [C]ompany will not be held against me."  *Id*.  Because of the vagueness of Mr. Pental's deposition testimony, it is unclear, without more, whether he is concerned about risking his job as a result of his allegedly reporting SEC violations involving the SIC's accounting of the Bedrock Transactions  in July-August 2018 or his criticisms of Mr. Palakodati's management and meddling in his personal affairs.  Additionally, there is no competent summary judgment evidence that SIC's accounting of

the Bedrock Transactions or the related protected activity that Mr. Pental allegedly engaged in was discussed or even mentioned during the Atlanta meeting.

Mr. Pental's interrogatory response and deposition testimony regarding this matter are even vaguer than what he now argues—that the Company or Mr. Johnson threatened to fire him during the Atlanta meeting "if he did not stop raising the MQ accounting issues." Def.'s Resp. 33. Accordingly, Mr. Pental's characterization of this evidence is not accurate, and neither supports his assertion that he suffered a materially adverse action in retaliation for allegedly engaging in protected activity. Further, any alleged self-serving statement by Mr. Pental *after* Mr. Johnson threatened to fire one or all of them if they could not find a way to work together in a productive rather than a dysfunctional manner does not convert the threat into a materially adverse action supporting Mr. Pental's claim that he was being retaliated against for engaging in protected activity four months earlier. Thus, this contention by Mr. Pental is not supported by the evidence, conflicts with his own deposition testimony, and it is insufficient to show that he suffered a materially adverse action.

### ix.   "[The Company] told other employees that he was "moving on" from the Company[] in mid-January 2019[.]"[32]

By arguing that the Company told other employees he was "'moving on' *from the Company*," Mr. Pental suggests that employees were being told that he was leaving the Company. Once again, however, the evidence Mr. Pental relies on—the two e-mails he sent in January 2019 on this topic, one to Peter Pichette regarding rumors and one to himself documenting events he purportedly observed—does not substantiate his contention in this regard.  Instead, as previously

---

[32] Def.'s Resp. 33 (citing Def.'s App. 479, 483).

noted,[33] these e-mails indicate that he was aware that the rumors pertained to Mr. Johnson's decision to change his role in the Company and give him a new title working directly under him so he would no longer have to work with or report to Mr. Palakodati.  Other evidence summarized in the background section of this opinion similarly indicates that the "rumor" pertained to the change in Mr. Pental's job title and responsibilities, not to his leaving the Company.  *See supra* at 19 (citing Def.'s App. 488) (Mr. Pichette's confidential e-mail dated January 30, 2019, to upper management—"All I have been advised by Ty Johnson that effective immediately, Peter Pental will no longer be acting in the capacity of COO and will be reporting directly to Ty/SIC focused on manufactured quartz strategy efforts.").  While Mr. Pental took the position in certain e-mails that he had not yet accepted the new role or position, this is different from the argument he makes in response to the Company's Motion—that the Company told other employees he was "'moving on' *from the Company.*"

Moreover, Mr. Pental's e-mail to Mr. Pichette regarding "rumors about my moving on" are not actionable, as evidence of rumors and being treated less cordially has been held to not rise to the level material adversity.  They "[i]nstead . . . fall into the category of 'petty slights, minor annoyances, and simple lack of good manners' that employees regularly encounter in the workplace, and which the Supreme Court has recognized are not actionable retaliatory conduct." *Aryain*, 534 F.3d at 485 (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).  Thus, even if the Company could have handled the dissemination of this information in a more sensitive manner, it is not actionable retaliation.  *See id.*

In reality, Mr. Pental's complaint is that he was unhappy with Mr. Johnson's decision to change his title and role in the Company.  When he complained in the fall of 2018 to Mr. Johnson

---

[33] *See supra* at 18-19.

and human resources about Mr. Palakodati's management style and meddling, Mr. Pental's hope and goal were to have Sunil moved to a different area of the Company, but Mr. Johnson instead chose to change Mr. Pental's role and responsibilities in the Company to minimize the interactions between him and Sunil.  For the reasons already discussed, Mr. Pental has not shown that Mr. Johnson's decision in this regard was actionable retaliation.  *See supra* at 43-46.

> **x.   "[The Company] drafted a severance agreement for Mr. Pental on or before January 4, 2019, which it refused to provide him in order to withhold his severance payment from him, in violation of his contract[.]"[34]**

It is not entirely clear what is meant by this contention that the Company "drafted a severance agreement for [him] on or before January 4, 2019, which it refused to provide [to] him . . . to withhold his severance payment . . . in violation of his contract."  Def.'s Resp. 33.  If Defendant contends that the Company refused to provide him severance in accordance with the amended employment agreement proposed by Mr. Johnson, it is undisputed that he rejected any such agreement to the extent his salary and other benefits differed from those in his initial Employment Agreement with Trive.  *See* Def.'s Resp. 17.  Likewise, if Defendant contends that the Company refused to give him the opportunity to agree to a draft employment agreement containing severance terms that differed from his original Employment Agreement, this is an irrelevant or moot point given his admission that this proposed agreement was presented to him by Mr. Johnson and rejected by him.  *See id.*  Other evidence similarly indicates that any severance owed to Defendant would be governed by his original Employment Agreement with Trive. On January 3, 2018, Mr. Johnson in response to inquiries about potential end-of-year employee severances and terms of the severances for Luke Spiller, Ravi Pental, and Mr. Pental,

---

[34] Def.'s Resp. 19-20, 33 (citing Def.'s App. 464-68).

**Memorandum Opinion and Order – Page 56**

responded: "I am only dealing with Peter. At this point there has not been a change in the agreement Peter Pental signed with Trive Capital." *See* Def.'s App. 464.

Defendant's contention that a severance agreement with terms that differed from those in his original Employment Agreement was "drafted on January 4, 2019," appears to be based on other e-mails circulated on this date, but there is no indication from these e-mails that an agreement other than his original Employment Agreement with Trive governed the terms of any severance owed to him. *See* Def.'s App. 461, 466, 467. Another e-mail circulated on January 6, 2019, quotes some of the language from Mr. Pental's Employment Agreement. *See* Def.'s App. 461. Merely quoting the circumstances under which he would be entitled to severance and other benefits, however, is not an admission by the Company that Mr. Pental was owed severance he was not paid.

Moreover, between January 9 and at least January 29, 2019, it is clear from Defendant's evidence that Mr. Pental had not yet quit and had not been fired. Discussions regarding Mr. Pental's new role in the Company were still being discussed until January 29, 2019, when Mr. Johnson made clear that the changes regarding Mr. Pental's role would be implemented with his compensation and benefits remaining the same notwithstanding Mr. Pental's e-mail on January 23, 2018, officially advising that "I won't be able to accept the new role[.]" Def.'s App. 486. Thus, evidence of internal discussions regarding the severance terms in his Employment Agreement that would govern his ultimate departure from the Company at some later date is quite beside the point. *See* Def.'s App. 469-79.

The court, therefore, fails to see why Mr. Pental believes that this is evidence of a materially adverse action supporting his retaliation claim. The issue is not adequately briefed from a legal, factual, or argument standpoint. Consequently, the point that Mr. Pental is

attempting to make here is unclear.  Finally, to the extent Defendant contends that this conduct violated his contract, that argument fails too and is addressed herein with respect the Company's argument that it is entitled to summary judgment on his breach of contract claim pertaining to severance.

### xi.    **"The Company [c]aused Mr. Pental to [s]uffer [m]aterially [a]dverse [a]ctions" that culminated in "[h]is [c]onstructive [d]ischarge."[35]**

Mr. Pental's argument that he was constructively discharged is premised on all of his foregoing contentions that he suffered various materially adverse actions in retaliation for engaging in allegedly protected activity.  He contends that these actions by the Company satisfy all of the legal factors that courts consider in determining whether an employee was constructively discharged.  Specifically, he contends that the evidence in this case supports a finding that he was constructively discharged in retaliation for his allegedly engaging in protected activity because the Company: "demoted [him]"; "attempted to reduce his salary"; "reduced and then removed all of his job duties"; "harassed and humiliated him"; "ordered at least one manager to fire him"; "agreed to employ him on substantially less favorable terms"; and "had a clear plan to terminate his employment."  Def.'s Resp. 35.

According to Mr. Pental, this evidence shows that "the Company made [his] working conditions 'so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign.'"  *Id.* at 34 (quoting *Landgraf v. USI Film Prods*., 968 F.2d 427, 429 (5th Cir. 1992) (other citations omitted)).  Mr. Pental further asserts that the evidence in this case of constructive discharge is "far more compelling" than other Fifth Circuit cases in which constructive discharge was found because "the Company's plan to terminate him was clear and

---

[35] Def.'s Resp. 32-34.

imminent. As [he] correctly described, the Company had "walk[ed] me to the door." Def.'s Resp. 35 (quoting Def.'s App. 474); *see also* Def.'s Resp. 34-35 (discussing *Guthrie v. J.C. Penney Co*., 803 F.2d 202, 207 (5th Cir. 1986); and *Stephens v. C.I.T. Grp./Equip. Fin., Inc.*, 955 F.2d 1023, 1028 (5th Cir. 1992)).

The Company disagrees and responds that Mr. Pental has failed to point to any evidence that would allow a jury to find that he suffered any unfavorable personnel action, and all of his contentions regarding adverse actions are contradicted or unsupported by the evidence, or insufficient as a matter of law.  The Company, therefore, argues that the actions relied on by Mr. Pental do not meet the criteria for constructive discharge in this Circuit because he suffered no loss in benefits and, at most, experienced only trivial workplace annoyances. The Company further asserts that the evidence, instead, shows that Mr. Pental "wanted to leave the Company and was willing to do so for one year's severance and a release of his non-compete" agreement.  The Co.'s Reply. 19.

In *Stephens*, an age discrimination case, the Fifth Circuit determined that "the cumulative effect of [the defendant's] actions made the working conditions [of the plaintiff] so intolerable that a reasonable person would have felt compelled to resign." 955 F.2d at 1027. The plaintiff in *Stephens* was demoted from division head to a sales position, asked to train his young successor, and stripped of all supervisory duties, and, although the plaintiff had previously supervised the entire San Antonio division, he was no longer allowed to assist the credit department without another member of that department. *Id.*  The plaintiff's salary was also reduced from $53,500 to $43,200 after he was told there would be no reduction in his salary.  *Id.*  Every time a new restraint was imposed on the plaintiff in the form of a salary cut or responsibility, his employer would repeatedly ask whether he was going to quit.  *Id.*

In *Guthrie*:

> All of the witnesses to District Manager Moore's two visits testified that he strongly criticized Guthrie in front of his staff. Guthrie and several of his staff members stated that morale was low and that Guthrie's authority suffered as a consequence. Moore's downgrade of Guthrie from a three to a four was a recognized first step toward dismissal, although witnesses disputed how long Guthrie had to make improvements before he would be fired. Guthrie testified that he believed it impossible to improve so long as the store was operating with a reduced staff, breaking in a new inventory control system, and undergoing remodeling. The jury had substantial evidence to find this perception reasonable, as well as Guthrie's conclusion that termination was inevitable.

*Guthrie*, 803 F.2d at 207.

The facts in this case, as reflected in the competent summary judgment evidence, are distinguishable from those in *Guthrie* and *Stephens* for many of the reasons already discussed. The court, therefore, disagrees with Mr. Pental's contention that the events predating his departure from the Company are similar to or "far more compelling" than those in *Stephens* or *Guthrie*. Moreover, as the Company correctly points out, most of Mr. Pental's factual assertions are not supported by the evidence in this case.

At most, the evidence in this case suggests that the cumulative effect of the Company's actions made Mr. Pental subjectively unhappy and frustrated because, instead of changing Mr. Palakodati's role and responsibilities as he had suggested, Mr. Johnson decided to make changes to Mr. Pental's role and responsibilities after he made a formal and informal complaint about Mr. Palakodati's management and meddling in his personal affairs, and he continued to complain about Mr. Paladokati's management after the Atlanta meeting. *See* Def.'s App. 474. Whether Mr. Pental subjectively felt compelled by these changes to resign, however, is irrelevant because the test of whether a reasonable employee would feel compelled to resign is an objective one. *Barrow*, 10 F.3d at 297 n.19. (citation omitted). Accordingly, Mr. Pental's evidence of the Company's actions

are insufficient to support a finding that he was subjected to a constructive discharge adverse action.

For this and all of the other reasons explained, Mr. Pental has failed to meet his burden of establishing that he suffered a materially adverse action as required to support his SOX retaliation claim. Having determined that he has not satisfied this element of his retaliation claim, the court need not address whether he can satisfy the remaining elements. Even assuming that Mr. Pental can satisfy all of the elements of his retaliation claim, including the requirement that he demonstrate that one or more of the Company's actions rises to the level of being materially adverse, his SOX retaliation claim still fails because the Company has come forward with clear and convincing evidence that it would have taken the same personnel actions regardless of whether Mr. Pental engaged in the alleged protected activity concerning SIC's accounting of the Bedrock Transactions.

**b. Whether the Company would have taken the same personnel actions**

The Company contends that the following evidence satisfies its burden of coming forward with clear and convincing evidence that it would have taken the same personnel actions that form the bases for Mr. Pental's retaliation claim under SOX regardless of whether he engaged in protected activity:

> [I]n response to a deteriorating relationship between [Mr.] Pental and his supervisor, Mr. Palakodati, including [Mr.] Pental's request that Mr. Palakodati be transferred to a different role, Mr. Johnson attempted to promote [Mr.] Pental to a more strategic role within the business in an effort to keep [Mr.] Pental with the Company. Johnson Dep. 233:5-13 [The Co.'s App. 101]; Pental Dep. 85:22-86:1 [The Co.'s App. 23]; Pental Dep. 88:24-91:12 [The Co.'s App. 23-24] and Exhibit 5 therein. In this new role, [Mr.] Pental would report directly to Mr. Johnson, which would allow [Mr.] Pental to engage in tasks he expressed a preference for. Johnson Dep. 313:13- 314:11 ("Because I thought they were valuable. I thought they were good for the company. My interactions with both of those guys had always been pleasant. I found them to be professional. I found them to be knowledgeable. I

**Memorandum Opinion and Order – Page 61**

found them to be useful. I really struggled with why those folks in that organization, ASG, were having so many issues because when you look at all three of them on an individual basis, in my view, they are all very capable, and they are all kind of, you know, very necessary."). [The Co.'s App. 112-13] This was a legitimate business decision, with no connection to Pental's purported whistleblowing months prior.

The Co.'s Br. 32.

Defendant responds that, in relying solely on Mr. Johnson's deposition testimony, the Company "ignores the other[] overwhelming contradictory record evidence." Def.'s Resp. 41. In this regard, Defendant first contends that in, *Hendrick v. ITT Engineered Valves, LLC*, a reduction-in-force or RIF case, the district court:

> denied summary judgment to an employer who showed that five days before the plaintiff engaged in protected activity, he was on a list of employees to be cut during a RIF. The district court determined that the employer's evidence was not "clear and convincing," because the list was preliminary and not "definitive," and there were "too many factual disputes" for the Court to rule for the employer.

Def.'s Resp. 41 (citing *Hendrick v. ITT Engineered Valves, LLC*, No. 1:16-CV-204-SA-DAS, 2018 WL 837600, at *5 (N.D. Miss. Feb. 12, 2018) (internal citations omitted).

It is unclear what "overwhelming" evidence Defendant is relying on to support this RIF argument and rebut the Company's evidence of why it would have taken the same complained of actions regardless of whether Mr. Pental had engaged in protected activity. As previously noted, there is evidence in the record regarding layoffs, including: (1) the November 1, 2018 e-mail that Mr. Pental sent to Mr. Johnson in which he criticized Mr. Palakodati's business decisions and leadership and blamed low employee morale on recent layoffs;[36] (2) the SIC power point presentation titled: "ASG: Headcount Reductions–Synergy & Investment Optimization," referencing a company-wide reduction in force that included "the exit of certain founders" but was

---

[36] The Co.'s App. 38-39.

not limited to founding members or the persons (Mr. Pental and Luke Spiller) who had allegedly

engaged in protected activity;[37] and (3) Sunil's e-mail and response to Mr. Pental's formal August

38, 2018 complaint against him in which he advises Mr. Johnson that between the increased

pressure placed on the founding members of the past few months after they failed to meet projected

targets and the recent RIF discussions, which employees were already talking about, he anticipated

there would be "more people on the edge."[38]   Regardless, the Company does not rely on a RIF

argument or evidence to support its position that it would have taken the same complained of

actions even if Mr. Pental had engaged in protected activity.   Accordingly, Mr. Pental's RIF

argument or case law, which is not actually tied to this case in anyway by his summary judgment

response, is not relevant to this issue.

Mr. Pental next argues that he "has adduced significant evidence that his protected activity

contributed to the Company's decision to discharge him—more than sufficient to rebut Mr.

Johnson's deposition testimony about a fictitious 'promotion.'" Def.'s Resp. 42. For support, he

contends:

> by January 4, 2019, the Company prepared a severance agreement for [him] and
> noted that he "will get paid severance[]" but "is not required to perform any
> additional work or meet any other requirements." [Def.'s] App. 466. Consistent
> with this position, and after the Company's general counsel instructed HR to "send
> formal documents to Peter," on January 29, 2019, Mr. Johnson told [him] he would
> no longer be COO, had no day-to-day responsibilities and should not report to work.
> [Def.'s] App. 484; 486; 719:15-23; 721:21-722:10.

*Id.*

---

[37] Def.'s App. 418-19.

[38] Def.'s App. 415-1.

**Memorandum Opinion and Order – Page 63**

To this, the Company replies and reiterates that it would have taken the same actions in changing Mr. Pental's role and responsibilities in the Company regardless of whether he had engaged in protected activity under SOX because the undisputed evidence demonstrates that:

> [He] complained to human resources about [Mr.] Palakodati because of alleged family drama. [Def.'s App. 414-15] [Mr.]Johnson understood there were personal issues between several Company employees, and sought to ensure everyone could "find a way to work together." [Def.'s App. 414-15] Following [Mr.] Pental's request that his supervisor [Mr.] Sunil Palakodati be transferred to a different role, [Mr.] Johnson tried to alleviate [Mr.] Pental's concerns by promoting him and assigning [Mr.] Pental duties he would excel at. [The Co.'s App. 23-24, 101, 112-13]. [Mr.] Johnson also testified that he was "trying to be helpful" to [Mr.] Pental and that nobody else told him to create a new role for [Mr.] Pental. [The Co.'s App. 112-13] Even well after the fact, [Mr.] Johnson's testimony still praised [Mr.] Pental—stating "I thought they were valuable. I thought they were good for the company. My interactions with both of those guys [Mr. Pental and Luke Spiller] had always been pleasant. I found them to be professional. I found them to be knowledgeable. I found them to be useful. I really struggled with why those folks in that organization, ASG, were having so many issues because when you look at all three of them [Mr. Pental, Luke Spiller, and Mr. Palakodati] on an individual basis, in my view, they are all very capable, and they are all kind of, you know, very necessary." [The Co.'s App. 112-13] As CEO, [Mr.] Johnson would have had to navigate these interpersonal workforce issues, regardless of whether [Mr.] Pental partook in protected activity—and the aforementioned testimony makes clear [Mr.] Johnson wanted to keep [Mr.] Pental around. Therefore, Johnson's decision to offer [Mr.] Pental a promotion was a legitimate business decision with no connection to [Mr.] Pental's supposed whistleblowing several months prior.

The Co.'s Reply 22-23.

As a preliminary matter, the court notes that the issue at this juncture is not, as Mr. Pental contends, whether his alleged protected activity was a contributing factor in the personnel actions taken by the Company.  Instead, the court's analysis assumes for purposes of addressing this issue that Mr. Pental has satisfied the requirements for his SOX retaliation claim, including that his alleged protected activity was a contributing factor in the personnel actions taken by the Company. Thus, any contention that alleged protected activity was a contributing factor in the personnel actions taken by the Company is irrelevant, as the issue now that the court focuses on is whether

the Company has met its burden to prove by clear and convincing evidence that it "would have taken the same unfavorable personnel action in the absence of that behavior." *Murray*, 601 U.S. at 24.

Contrary to Mr. Pental's assertion, the Company's evidence in this regard does not rely solely on Mr. Johnson's deposition testimony; nor is it limited to the Company's summary judgment evidence. The Company also relies on Mr. Pental's evidence. Moreover, it is undisputed that the November 2018 meeting in Atlanta came on the heels of Mr. Johnson receiving complaints from Mr. Pental and Luke Spiller on one hand, and Mr. Palakodati on the other hand, about each other.

While Mr. Pental contends that veiled threats were directed at him during this meeting in response his engaging in protected activity, there is no competent summary judgment evidence that supports this assertion. Instead, both side's evidence consistently shows that this meeting was held to address the dysfunctional relationships between Mr. Pental, Luke Spiller, and Mr. Palakodati, who Mr. Johnson viewed as the three key people in the Company, and what would happen if they could not get along. It is also undisputed that Mr. Johnson warned all three of them that, if they were unable to get along, he would fire one or all of them or would make necessary changes, including different roles, because he owed a fiduciary duty to the Company and believed that the organization could not continue to work the way it was working. Mr. Johnson admitted that he started making changes to Mr. Pental's role in the Company after the Atlanta meeting such that Mr. Pental would be reporting directly to him rather than Mr. Palakodati, but he denied making this and other changes because of Mr. Pental's alleged reporting of SIC accounting issues in the summer of 2018. He testified that it was apparent that Mr. Pental did not want to work with Mr. Palakodati, and Mr. Pental did not believe that Mr. Palakodati was a good leader.

In an effort to rebut the Company's evidence that it would have taken the same actions regardless of whether he engaged in protected activity, Mr. Pental also relies on three e-mails and his deposition testimony in an attempt to weave together a theory of how it was the Company's intent all along to fire him for allegedly reporting SIC accounting issues. When viewed in isolation, this theory appears to have "legs," but upon closer inspection of Mr. Pental's evidence and the evidence of other communications circulating within the Company at the time, it is apparent that the theory and his related arguments do not accurately reflect the evidence in this case.  In addition, the cherry-picked language from the three e-mails that he relies on and quotes in support of his argument is taken out of context.

For example, Mr. Pental relies on a January 4, 2019 e-mail from Peter Pichette to Lance Brown with the "Subject: RE: Severance/Restructuring Confirmation" in which he details the "current status for ASG" regarding the contractual severance and restructuring negotiations for Mr. Pental, Ravi Pental, Luke Spiller, and Mr. Dougherty.  Def.'s App. 466. Mr. Pental focuses on and quotes the "Peter will be get paid severance" language in this e-mail apparently to show that the Company was already making plans at this time to fire him.  *Id.*  This e-mail, though, makes clear that Peter Pental's status was unknown at this time and still subject to negotiation:

> Peter Pental—negotiation of a new contract w SIC? I spoke to Pete and Peter will get paid severance based on his employment agreement (attached). He will be paid the severance and is not required to perform any additional work or meet any other requirements other than non-compete. Ty may negotiate a separate consulting agreement where we pay him for consulting services only if needed but this remains to be seen.

*Id.*  Mr. Pental's evidence also shows that this e-mail was circulated in response to an e-mail sent by Lance Brown, who explained: "As you know, we are in the process of closing the books for the year" and "I will be performing this inquiry on a quarterly basis going forward as . . . a formal control . . . to help ensure all severance/restructuring related activity is known and accounted for

correctly." Def.'s App. 467. Accordingly, this was not a discussion or acknowledgement that Peter Pental's employment had been terminated but instead part of a broader discussion and internal process to account for all severances from the Company *and* all restructuring agreements within the Company. *See id.*

Mr. Johnson was not copied on these and other e-mails circulated close to this time that inquired or speculated about Mr. Pental's status, but when contacted via a separate e-mail during this same time for information regarding his status, Mr. Johnson clarified that "I am only dealing with Peter. At this point there has not been a change in the agreement Peter Pental signed with Trive Capital." Def.'s App. 464. Subsequently, on January 8, 2019, Mr. Johnson informed Mr. Palakodati via e-mail regarding the changes to Mr. Pental's role and responsibilities in the Company, Def.'s App. at 469-70, to which Mr. Palakodati responded, "Ty, Works for me. Thank you." *Id*.

Mr. Palakodati then prepared and issued an "ASG Supply Chain Update" announcing these and other Company changes that were distributed via e-mail on January 10, 2019, to the "Purchasing ASG" group of suppliers. *Id*. at 471, 473. The Update stated that "Peter Pental will transition from his natural stone procurement responsibilities into a strategic advisory role working closely with Myself and the SIC leadership team on Petal product growth initiatives." Def.'s App. 473. On January 30, 2019, Peter Pichette also sent the "CONFIDENTIAL" e-mail to the small management group that similarly advised them regarding the changes to Mr. Pental's role and responsibilities in the Company. *Id.* at 488. Accordingly, when viewed in the context of what else was occurring and being said within the Company at the time, the January 4, 2019 e-mail and severance language in that e-mail relied upon by Defendant do not support the reasonable inference that the Company was planning all along to fire him because he allegedly reported SIC accounting

issues in the summer of 2018. Instead, the evidence at most shows that Mr. Johnson and Mr. Pental were still discussing and negotiating changes to Mr. Pental's role in the Company at this time that had not yet been implemented.

Mr. Pental also attempts to build on the unsupported inference that the Company was making plans as of January 4, 2019, to fire him by arguing that e-mails subsequently sent by Peter Pichette and Mr. Johnson on January 25 and 29, 2019, show that, "[c]onsistent with this position, and after the Company's general counsel instructed HR to 'send formal documents to Peter,' on January 29, 2019, Mr. Johnson told [him] he would no longer be COO, had no day-to-day responsibilities and should not report to work." Def.'s Resp. 42.

In the January 25, 2019 e-mail to Mr. Palakodati, Mr. Pichette simply states: "He agrees we need to send formal documents to Peter and Ravi. We have a follow up call on Monday. FYI." Def.'s App. 484.  It is not clear from this e-mail who "He" is or what "formal documents" were supposed to be sent to Mr. Pental and his brother Ravi, or whether, as Defendant contends, that this was an instruction to the Company's human resources department that came from the Company's general counsel. It is undisputed that Ravi Pental did not engage in any protected activity, so reference to him in this e-mail undercuts any argument by Mr. Pental that this is evidence of the Company's intent all along to fire him for engaging in protected activity. During this same time, Mr. Pental and Mr. Johnson were discussing the terms of a new employment agreement, so the reference to "documents" could have referred to this proposed agreement rather than termination documentation.  In other words, this e-mail raises more questions that it answers and does not support Mr. Pental's retaliation theory.

In the January 29, 2019 e-mail to Mr. Pental, Mr. Johnson responds to Mr. Pental's "official" January 23, 2019 e-mail in which Mr. Pental advised "I won't be able to accept the new

role[.]"  Def.'s App. 496.  In this e-mail, Mr. Johnson implied that the changes to Mr. Pental's role and responsibilities were no longer up for debate or negotiation, but he did not tell Mr. Pental that his disagreement or refusal to accept the changes to his role and responsibilities in the Company would require his termination or resignation. Mr. Johnson also advised Mr. Pental that, in accordance with his prior request, his compensation and benefits would remain the same under his 2017 Employment Agreement with Trive.

Further, contrary to Mr. Pental's assertion, Mr. Johnson did not tell him that he "should not report to work."  Def.'s Resp. 42. He advised Mr. Pental that in his new role at SIC he would be focusing his efforts on the Company's "sourced quartz product line," that he would be performing this work remotely, and he would not be required to visit any of the branch facilities unless requested.  Def.'s App. 486. Mr. Johnson closed by advising Mr. Pental that he should contact Shawn Baldwin if he had any further questions.[39] As indicated, Peter Pichette sent a "CONFIDENTIAL" e-mail to management personnel the following day, detailing the same new role and responsibilities set out in Mr. Johnson's January 29, 2019 e-mail.  Thus, the January 25 and 29, 2019 e-mails, even when viewed together with the January 4, 2019 e-mail, are insufficient to raise a genuine dispute of material fact or rebut the Company's evidence that it would have taken the same actions in changing Mr. Pental's role and responsibilities in the Company to limit his interactions with Mr. Palakodati regardless of whether Mr. Pental had engaged in protected activity.

The deposition testimony relied on by Mr. Pental in which he summarizes the ways in which he believes that Mr. Johnson retaliated against him adds nothing of value to the court's

---

[39] It is not clear who Shawn Baldwin is from the parties' evidence.  Mr. Baldwin was copied on this e-mail and the earlier e-mails between Mr. Johnson and Mr. Pental that discussed the terms of Mr. Pental's new role, responsibilities, and compensation.

analysis, as this testimony simply reiterates his contentions regarding the various personnel actions that have already been discussed herein at length. *See* Def.'s App. 719:15-23 721:21-722:10.

As noted, the court assumes that Defendant has established all requirements for his SOX retaliation claim for purposes of addressing, in the alternative, whether the Company has met its burden of showing that it would have taken the same actions even if Mr. Pental engaged in protected activity. Thus, even assuming that Mr. Pental satisfied his initial burden of establishing all of the requirements for his SOX retaliation claim, the Company is still entitled to judgment as a matter of law on this claim because it has shown by clear and convincing evidence that it would have taken the same actions under the circumstances in changing Mr. Pental's role and responsibilities in the Company regardless of whether he engaged in protected activity. The court determines that the Company's evidence is clear and convincing because it is consistent with other evidence relied on by both parties particularly when viewed in the context of all of the competent summary judgment evidence in this case.

On the other hand, Mr. Pental's reliance on conclusory arguments, unsubstantiated assertions, unsupported inferences and speculation, irrelevant matters, and numerous mischaracterizations of the evidence are insufficient to lead a rational finder of fact to find in his favor, particularly when the summary judgment record in this case is viewed as whole. Consequently, evening viewing all facts and inferences in the light most favorable to him, the court determines that there is no genuine dispute of material fact that remains for trial regarding his retaliation claim against the Company, which will be dismissed with prejudice. *Matsushita*, 475 U.S. at 587 (citation omitted).

B.      **Breach of Employment Agreement - Severance Pay (Defendant's Count II)**

1.   **The Parties' Contentions**

AGM contends that Mr. Pental is not entitled to severance pay or relief as a result of AGM's not paying him severance because his claim for breach of the Employment Agreement fails.[40]   As indicated, AGM argues that its obligation under the Employment Agreement to pay severance is expressly conditioned on Mr. Pental satisfying the unambiguous condition precedent in the contract that he execute a written release, and, according to AGM, he failed to do so.   AGM asserts that, while it was willing to pay Mr. Pental severance in exchange for a release, he also sought a release of his noncompetition obligations, which AGM construed as an improper attempt by him to renegotiate his employment agreements, "leverage an exit from [his] current employment," and "renege on [his] non-competition agreement."   The Co.'s Reply 24.

AGM further asserts that: (1) the Employment Agreement did not require it to "capitulate to [Mr.] Pental's severance demands"; and (2) it "also disagreed with [Mr.] Pental's assessment and was under no obligation to simply take [his] claim at face value."   *Id.*   In this regard, AGM contends:

---

[40] Although both AGM and SIC jointly moved for summary judgment, Mr. Pental's breach of contract claim is only against AGM. The court's discussion with respect to this claim, therefore, focuses on the conduct and arguments of Mr. Pental and AGM, not SIC or the Company, even though the parties sometimes blur this distinction.

[Mr.] Pental cites no contractual provision, case, or legal principle—because none exists—which stands for the proposition that [AGM] was required to renegotiate [his] non-compete or agree to a release favorable to [him]. The plain language of the employment agreement simply does not require [AGM] to capitulate to [Mr.] Pental's severance demands. Instead, [his] employment agreement required him to sign a release which [AGM] agreed to. The record evidence unequivocally demonstrates [AGM] was more than willing to provide severance, but [Mr.] Pental refused to sign a standard release without a waiver of his non-compete obligations. Unquestionably, [he] did not satisfy a condition precedent to receiving the severance payment in his employment agreement, and [his] breach of contract claim under Count II fails.

The Co.'s Reply 24.

Mr. Pental responds that, contrary to AGM's assertion, it was AGM, not him, that failed to perform a condition precedent under the Employment Agreement.  Mr. Pental asserts that his attorney "notified AGM on February 8, 2019, that [he] was terminating his employment for 'Good Reason,'" but "[AGM] failed to acknowledge [his] termination for 'Good Reason,' insisted that he terminated [his employment] 'without Good Reason,' [and] stated that AGM 'will treat[ ]' his termination 'as such[.]'" Def.'s Resp. 42-43 (citing Def.'s App. 499, 503). Mr. Pental further asserts that, given AGM's statement that it would treat his termination as a "without Good Reason" termination, he would have waived all legal claims and would have received no severance pay under the Employment Agreement if he had signed and returned a release to AGM under these circumstances.  Def.'s Resp. 43 (citing and quoting *Sellers v. Minerals Techs., Inc.*, 753 F. App'x 272, 277 (5th Cir. 2018), for the conclusion that "condition precedents should not be enforced to 'impose an absurd or impossible result.'").

He, therefore, *appears* to argue, based on *Sellers*, that any requirement in the Employment Agreement that severance pay is conditioned on him executing a written release should not be enforced to the extent it would "impose an absurd or impossible result."[41]  *Id.*  In addition, he

---

[41] The court emphasizes "appears" here because Mr. Pental cites *Sellers* for the proposition that a condition precedent should not be recognized if doing so "would impose an absurd or impossible result," but he does not expressly argue

contends that "[AGM] improperly focuses only on the provision that required [him] to sign a release, while ignoring the [contractual] provision that required [it] first to accept his 'Good Reason' termination and provide him a release[.]" Def.'s Resp. 44 (citing *Choice! Power, L.P. v. Feeley*, 501 S.W.3d 199, 206 (Tex. App.—Houston 2016, no pet.) ("The court may not consider any single provision, taken in isolation, as controlling, but must consider all provisions in context of the entire instrument."). Mr. Pental further contends that, because AGM prevented or made the occurrence of the release impossible by refusing to give him a severance payment in exchange for a release, it cannot not now rely on the nonoccurrence of the condition precedent that it caused to escape liability under the Employment Agreement.  Def.'s Resp. 42 (quoting *Sellers*, 753 F. App'x at 278-79 & n.7 (collecting cases)).

### 2.   Applicable Contractual Language

Section 5(g) of the Employment Agreement relied on by AGM provides:

> The Executive's right to receive the severance as set forth in 5(f)(ii) is **expressly conditioned** upon the Executive executing and delivering to the Company, within fifty (50) days of the date of termination of Executive's employment, a written release **in a form reasonably agreeable to the Company** and the expiration of the revocation period described therein without such release or any portion thereof having been revoked by Executive; **provided that such release shall not release any of Executive's rights or claims under any agreements, other than this Agreement** and any amendments or supplements to this Agreement, between the Executive and the Company or its Affiliates, including the Purchase Agreement and the LLC Agreement. . . . Executive shall not be entitled to any severance or other employment based compensation after his termination of employment except as set forth above in this § 5.

The Co.'s App. 123 (emphasis added).  Section 5(f)(i) states that an Executive is not entitled to severance pay if the Executive's employment is terminated by "the Company for cause, or by the Executive without Good Reason" during the term of the agreement.  Def.'s App. 52.  Only if the

---

that the court should not recognize any condition precedent in the Employment Agreement requiring him to execute a written release because doing so "would impose an absurd or impossible result."

Executive's employment is terminated under section 5(f)(ii) during the term of the agreement "by the Executive for Good Reason or by the Company without Cause," is the Executive entitled to severance pay.  *Id.* at 53.  As relevant here, section 5(d) defines "Good Reason" as: "[a]ny reduction by the Board of the Base Salary without Executive's consent, unless such reduction is part of a reduction of the salaries of all Company executives" or "any material breach of this Agreement by the Company."  *Id.* at 52.  As previously noted, the term "material breach" is not defined by the Employment Agreement.

### 3.  Texas Law Applicable to Contract Claims

The elements of a breach of contract claim under Texas law are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (applying Texas law and citing *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. Civ. App.—Houston [1st Dist.] 2001, no pet.)). "A breach occurs when a party fails to perform a duty required by the contract." *Smith Int'l, Inc.*, 490 F.3d at 387 (citation omitted).  "Whether a party has breached a contract is a question of law for the court." *X Techs., Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 413 (5th Cir. 2013) (quoting *Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied)).

"[W]hen one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199 (Tex. 2004) (per curiam). Prior material breach is an affirmative defense as to which the asserting party bears the burden of proof at trial. *O'Brien's Response Mgmt., L.L.C. v. BP Expl. & Prod., Inc.*, 24 F.4th 422, 434 (5th Cir. 2022) (citing *Tony Gullo*

*Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006)). "By contrast, when a party commits a nonmaterial breach, the other party is not excused from future performance but may sue for the damages caused by the breach." *Bartush–Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam) (internal quotation marks and citation omitted).

> In determining whether a breach is material, Texas courts consider five factors:
>
> 1) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> 2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> 3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> 4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; and
>
> 5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*O'Brien's Response Mgmt., L.L.C.*, 24 F.4th at 435 (quoting *Mustang Pipeline Co., Inc.*, 134 S.W.3d at 199). Whether a breach is material is ordinarily a question of fact that can only be decided as a matter of law "if reasonable jurors could reach only one verdict." *Bartush-Schnitzius Foods Co.*, 518 S.W.3d at 436 (citations omitted).

In construing a contract under Texas law, courts must "ascertain and give effect to the parties' intentions as expressed in the writing itself." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012) (citation omitted). " Accordingly, Texas courts "examine the entire contract in an effort to harmonize and give effect to all provisions so that none is rendered meaningless." *WBCMT 2007 C33 OFFICE 9720, L.L.C. v. NNN Realty Advisors, Inc.*, 844 F.3d 473, 478 (5th Cir. 2016) (citation omitted). Whether a contract is ambiguous is a question of law

for the court. *R&P Enter. v. LaGuarta, Gavrel & Kirk*, 596 S.W.2d 517, 518 (Tex. 1980) (citation omitted). When a contract's language "can be given a certain or definite meaning, it is unambiguous and interpreted as a matter of law by the court." *DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 100 & n.7 (Tex. 1999) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).  If, on the other hand, a contract's language is "subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (citation omitted).  Thus, dismissal of a contract claim is not appropriate when the contractual language at issue is ambiguous.

Regarding conditions precedent, the Fifth Circuit in *Sellers* explained:

> A condition precedent is "an act or event that must take place before performance of a contractual obligation is due." *Cedyco Corp. v. PetroQuest Energy, L.L.C.*, 497 F.3d 485, 488 (5th Cir. 2007) (citing *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976)). Because of their "harshness in operation," conditions precedent are generally not favored under Texas law and should not be recognized if "another reasonable reading of the contract is possible" or the condition "would impose an absurd or impossible result." *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). To make performance of a contractual obligation specifically conditional, generally a term "such as 'if,' 'provided,' 'on the condition that,' or some similar phrase of conditional language" must be included in the contract. *Cedyco Corp.*, 497 F.3d at 488 (quoting *Criswell*, 792 S.W.2d at 948). The absence of such a term is considered indicative of the parties' intent that a covenant be made, rather than a condition imposed. *Criswell*, 792 S.W.2d at 948; *Matter of Pirani v. Baharia, et al.*, 824 F.3d 483, 497 (5th Cir. 2016).

*Sellers*, 753 F. App'x at 277.  "When the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition."  *Criswell*, 792 S.W.2d at 948 (citation omitted).  Even when a condition precedent is not technically met, it can be appropriate to deem the condition fulfilled or excused under Texas law if one party prevents another from performing a condition precedent because a

party cannot escape liability under a contract by preventing the occurrence of a condition precedent. *Sellers*, 753 F. App'x at 278-79 & n.7 (citations omitted).

### 4. Discussion

Section 5(g) "expressly condition[s]" payment of severance on execution of a written release.  Because of the inclusion of this language, which is recognized under Texas law as necessary for creating a condition precedent, it is difficult to interpret such language as doing anything other than creating a condition precedent. *See id.* (citing *Ceydco Corp.*, 497 F.3d at 488).  Thus, the court concludes that the parties intended that execution of a written release by an Executive such as Mr. Pental was a condition precedent, not a covenant, to AGM paying him severance.  The court also notes that Mr. Pental does not dispute that the release requirement was a condition precedent to him receiving severance pay.

It is undisputed that Mr. Pental's attorney wrote to AGM on February 8, 2019, advising that his client was "willing to provide a complete release of all claims in exchange for one year's severance and a release from [his] noncompetition obligations as contained in [his] Employment Agreement[] and Securities Purchase Agreement[]." Def.'s App. 499. No release, however, was ever executed by Mr. Pental or provided to AGM.  Instead, Mr. Pental contends that his failure to provide a release was excused because: (1) AGM breached initially by failing to "first . . . accept his 'Good Reason' termination and provide him a release," Def.'s Resp. 44; and (2) in disputing that his termination was for "Good Reason," AGM prevented him or made it impossible for him to execute a written release, as doing so would lead to the absurd or harsh result of causing him to forfeit any severance and legal claims.

Regarding the first of these arguments, while Defendant contends that a contractual provision in the Employment Agreement required AGM to "first to accept his 'Good Reason'

termination and provide him a release," he fails to cite any provision of the Employment Agreement, and the court was unable to find any language in the contract that remotely supports this contention.  Thus, he has not shown that AGM first breached or materially breached the Employment Agreement such that he was excused from performing under the contract.  The court also disagrees that AGM's March 14, 2019 response and statement—that it intended to treat the termination of his employment as "without Good Reason"—prevented or made it impossible for him to provide a waiver as required to receive severance pay under section 5(g) of the Employment Agreement.  If Mr. Pental had executed a written release and provided it to AGM in accordance with section 5(g), and AGM refused to pay him severance, he could have sued for breach of contract, and the issue before the court would have been whether he terminated his employment for "Good Reason" such that AGM's refusal to pay him severance amounted to breach of the Employment Agreement.  In other words, in that situation, AGM could not have used a release by Mr. Pental, if one had been executed in accordance with the Employment Agreement, as a sword and a shield to deny him severance while at the same time claiming he released all legal claims, even though he received nothing in exchange.

It is clear from the language in section 5(g) that the parties intended that severance be paid in exchange for a release of certain rights. Contrary to Defendant's contention, his executing a written release would not have led to the absurd or impossible result that he necessarily would have waived all legal claims and would not have been entitled to receive severance pay under the Employment Agreement.  Again, if AGM had taken the position in response to a written waiver that termination of Mr. Pental's employment was "without Good Reason," and refused to pay severance, litigation might have been necessary to resolve the parties' dispute in this regard.  The

necessity of having to litigate one's rights might be inconvenient, but it hardly qualifies as an absurd or impossibly harsh result.

Further, while section 5(g) required Mr. Pental to release certain rights and claims he had under the Employment Agreement in exchange for severance pay, the release of legal claims in exchange for severance pay is not unusual.  Additionally, if Mr. Pental had executed a written release, and the termination of his employment satisfied section 5(f)(ii)'s definition of termination for "Good Reason," he would have been entitled to compensation in the form of severance pay in exchange for the release.  To the extent that Mr. Pental contends or intended to argue that his execution of a release would have precluded him from bringing this lawsuit or specific claims, this issue was not sufficiently developed by him from a factual or legal perspective for the court to address it, and the court declines to engage in conjecture or speculation.

Because there is no dispute that Mr. Pental did not provide or execute any release, and the court has determined that he was not excused from providing a release, it need not address AGM's contentions as to whether the terms of his proposal satisfied section 5(g).  Mr. Pental has failed to raise a genuine dispute of material fact regarding his performance under the Employment Agreement as it pertains to severance pay.  Accordingly, AGM is entitled to judgment as a matter of law regarding Mr. Pental's breach of contract counterclaim, which will be dismissed with prejudice.

### C.    Requests for Declaratory Judgment (Defendant's Counts III and IV)

Article III of the Constitution restricts "the judicial power of federal courts" to "cases" and "controversies." *Flast v. Cohen*, 392 U.S. 83, 94 (1968). "Concrete legal issues, presented in actual cases, not abstractions, are requisite." *United Public Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947). This limitation applies with equal force to declaratory judgments, as the text of the

Declaratory Judgment Act ("DJA") incorporates this constitutional limitation. *Id.* The DJA provides that a federal court may issue a declaratory judgment only "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). Supreme Court precedent requires:

> that the dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests"; and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).

"[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.*, 549 U.S. at 127 (citing *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). "A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character, from one that is academic or moot." *Aetna*, 300 U.S. at 240. In determining whether a declaratory judgment action involves a nonjusticiable "abstract question" or a justiciable "case or controversy," the facts of each case are carefully examined and consideration is given to the surrounding circumstances. *MedImmune*, 549 U.S. at 127 (citing *Maryland Cas.*, 312 U.S. at 273).

Mr. Pental's two counterclaims for declaratory judgment against AGM are based on Counts 1 and 2 of AGM's Second Amended Complaint, which pertain to section 6 of the Employment Agreement and section 6.1(c) of the Purchase Agreement. Specifically, he contends that these provisions are illegal and unenforceable because, although they allow him to disclose the Company's confidential information to SEC and OSHA with the Company's consent or as required by law, they do not permit voluntary disclosures of such information to SEC and OSHA. Mr.

Pental further contends that there is no legal requirement that a request for declaratory judgment relate to other claims in this litigation, but, regardless, his two requests for declaratory judgment do relate to other claims in this action because the Company retaliated against him for reporting its unlawful conduct, first by constructively discharging him, and then by filing this lawsuit against him.

Mr. Pental asserts that this conduct "creates a threat of future injury that the Company will continue to seek legal enforcement of the Agreements' confidentiality provisions against [him] on baseless grounds." Def.'s Resp. 49. He, therefore, argues that his two requests for declaratory judgment satisfy the actual case and controversy requirement and are closely tied to the claims in this lawsuit, as he seeks declaratory judgments "that the confidentiality provisions are invalid as a matter of law because they prohibit him from disclosing otherwise 'confidential information' to federal regulatory bodies." *Id.* (citing Second Am. Compl. ¶¶ 50, 57).

Contrary to Mr. Pental's assertion, AGM's claims for breach of the Employment and Purchase Agreements in the Second Amended Complaint are not premised on and do not include any allegations that he breached the Agreements by disclosing the Company's confidential information to OSHA, the SEC, or any other regulatory body. AGM also expressly concedes that it is not asserting any such claim against him. Moreover, to resolve Mr. Pental's counterclaim for alleged retaliation in violation of SOX, it is not necessary for the court to decide whether the Employment or Purchase Agreements allow or allowed him to voluntarily disclose the Company's confidential information to OSHA, the SEC, or any other regulatory body.

Thus, the court agrees with AGM that the issue presented by Mr. Pental's declaratory judgment counterclaims is nonjusticiable in that no substantial controversy of sufficient immediacy and reality exists between the parties to warrant the issuance of the declaratory

judgments sought.  Consequently, any ruling on these claims would amount to an impermissible advisory opinion.  Accordingly, the court lacks subject matter jurisdiction over Mr. Pental's declaratory judgment claims, which will be dismissed without prejudice for lack of jurisdiction.

## IV.    Conclusion

For the reasons explained, the court **concludes** that AGM and SIC are entitled to judgment as a matter of law as to all counterclaims asserted by Defendant.  Accordingly, the court **grants** the Company's Motion (Doc. 162).  The Motion is **granted** with respect to Mr. Pental's breach of contract claim and claim for alleged retaliation in violation of SOX, as he has failed to raise a genuine dispute of material fact with respect to each element of these claims, and the Company came forward with clear and convincing evidence that it would have taken the same actions even if he had engaged in protected activity in violation of SOX.  The Motion is also **granted** as to Mr. Pental's two counterclaims for declaratory judgment; however, as the basis for dismissal of his declaratory judgment claims is jurisdictional, these claims are **dismissed without prejudice** for lack of subject matter jurisdiction, whereas his breach of contract and SOX retaliation claims are **dismissed with prejudice**.

**As a result of these rulings regarding Defendant's counterclaims, only AGM's two claims for breach of contract against Mr. Pental and Mr. Pental's defenses to these claims remain for trial.[42] Given the court's rulings and the age of the case, it strongly encourages the parties to consider an expeditious resolution of the remaining claims and defenses. The court's rulings have significantly reduced the issues that remain in this case.  In the court's view, neither side is "out of the woods" yet as far as their ability to prevail at trial on these claims and defenses. Accordingly, now is an excellent time for the parties to take a serious**

---

[42] As indicated, Defendant's Motion for Partial Summary Judgment as to these claims and the defenses to these claims was previously denied. *See* Doc. 226.

**Memorandum Opinion and Order – Page 82**

look at the realistic strengths and weaknesses of their remaining respective claims and defenses to determine whether a settlement can be reached that would resolve the parties' dispute and this litigation without further court intervention.

Accordingly, the court **directs** the parties to file a joint submission informing it no later than **August 20, 2024**, whether they can resolve this case without further court involvement. Mindful of the ever-increasing costs, the court is willing to assign this case to a magistrate judge to conduct a settlement conference or mediate at no cost to the parties. If the parties prefer such an assignment, their August 20, 2024 joint submission **shall** include so inform the court.

**It is so ordered** this 6th day of August, 2024.

Sam A. Lindsay
United States District Judge